RICHMOND NATURAL GAS COMPANY *v.* ENTERPRISE NATURAL GAS COMPANY ET AL.

[No. 4,616. Filed March 19, 1903. Rehearing denied May 26, 1903.]

NATURAL GAS.—*Transportation by Artificial Means.*—*Injunction.*—The use of pumps or compressors in the transportation of natural gas is not prohibited by §7507 Burns 1901, which provides that natural gas "shall not be transported through pipes at a pressure exceeding 300 pounds per square inch, nor otherwise than the natural pressure of the gas flowing from the wells," and an adjoining landowner tapping a common reservoir is not entitled to an injunction to restrain defendant from transporting gas by merely showing the use of the pumps, nor by showing that he is injured because the gas is being wastefully diminished by the use of the pumps. *pp. 229–234.*

SAME.—*Transportation by Artificial Means.*—*Injunction.*—*Increase of Flow from Wells.*—To entitle one interested in a common reservoir of natural gas to an injunction, under §§7507–7509 Burns 1901, restraining another from transporting natural gas therefrom by artificial means, it must be shown that the artificial means so used will increase the flow of gas from the wells. *pp. 230, 231.*

SAME.—*Transportation by Artificial Means.*—*Injunction.*—*Special Finding.*—*Appeal and Error.*—Where in a suit to enjoin the transportation of natural gas by artificial means the court found as an ultimate fact that the use of the pumps has the effect of increasing the general flow of gas from the wells, and also found the primary facts from which it appears that the use of the pumps would not increase the amount of gas coming from the wells, through the natural laws of flowage, the ultimate fact so found will be disregarded on appeal. *pp. 234, 335.*

From the Superior Court of Madison County; *H. C. Ryan*, Judge.

Suit by the Enterprise Natural Gas Company and others against the Richmond Natural Gas Company. From a judgment for plaintiffs, defendant appeals. *Reversed.*

*R. A. Jackson, H. C. Starr, J. F. Robbins, J. C. Blacklidge, C. C. Shirley* and *Conrad Wolf*, for appellant.

*E. H. Bundy, J. M. Morris, M. E. Forkner* and *G. D. Forkner*, for appellees.

ROBINSON, J.—Suit by appellees for an injunction to prevent the use by appellant of compressors and appliances to increase the natural flow of gas from wells, and to prevent the transportation of gas through pipe-lines otherwise than by the natural pressure from such wells.

The complaint in this case is not sufficient as a complaint to enjoin the maintaining of an excessive pressure in the lines, but giving it the theory that it seeks to prevent the use of pumps or other artificial means for the purpose of increasing the natural flow of gas from the wells, we think it states a cause of action.

The questions presented arise out of the conclusions of law upon the following facts specially found: All the parties to this suit have an interest in common in the undeveloped gas which is within a common reservoir underlying certain described territory, and each owns leases and gas-wells in this territory which are producing gas which is used in various ways by the respective parties; that the salt water beneath and around this reservoir is held back by the pressure of the gas in the rock, and any reduction of the gas pressure tends to admit the salt water into the rock; and whenever the gas pressure is reduced below the pressure of the salt water it at once enters the rock, and destroys the territory to the extent that it is admitted; that the reduction of the gas pressure in the rock tends to the irreparable injury and final destruction of the gas field and

common reservoir. Appellant is a corporation engaged in furnishing natural gas to the citizens of Richmond, about thirty-eight miles from this gas territory, and has a number of pumps and compressors which it is threatening to use for the purpose of forcing gas through its pipe-lines; that at and prior to the bringing of this suit it had procured leases on a large number of tracts of land within this territory, and had drilled forty-six gas-wells, and connected them by pipe-lines with its pumping-station, and laid from the station to the city of Richmond an eight inch pipe-line.

The ninth, tenth, eleventh, and twelfth findings are as follows: "(9) That said pumps and compressors are and constitute devices for pumping gas, and have the effect of stimulating and increasing the general flow of natural gas from the wells, and of increasing and maintaining the flow of natural gas through the pipes used for conveying and transporting the same; that at the bringing of this suit the defendant was threatening and intending to use and operate said pumps and pumping station for the object and purpose aforesaid; that the use of said pumps will give to the defendant an undue proportion of said gas within said reservoir, above what would naturally flow through its pipes and mains by the natural pressure of gas, and will thereby take from all others, and especially the plaintiffs, having an interest in said field, a large portion of said gas, which would naturally flow to them if said reservoir and field was left unaffected by artificial appliances; that the use of said pumps will unduly reduce the back-pressure of the gas in said field and reservoir, and thereby induce salt water to enter the same, to the great and irreparable injury of said common reservoir, and of the rights and property of the plaintiffs therein. (10) That the defendant could not carry gas from its wells in Henry county to its patrons in Richmond by the use of its pumps in greater quantity than would be conveyed by the natural or well pressure, without

increasing the natural flow of gas in its mains. (11) That it is the intention of the defendant, and was when this suit was begun, to use its said pumps and compressors to transport more gas through its pipe-lines from its wells in Henry county to its patrons at the city of Richmond, in Wayne county, than could or would flow naturally through its lines of pipe by well pressure, and without the aid or assistance of said pumps or compressors. (12) That the use and operation of said pumps and compressors will take more gas from the intake of the said pumps, or the side between said wells and said pumps, than would flow into and through the said pumps by reason of the natural well pressure, and would stimulate the flow of gas into said pumps and into defendants' gas-mains."

It is further found that any gas drawn from the lands of either of the parties to this suit diminishes to that extent the common supply contained in the reservoir; that when this suit was brought the parties had a large number of wells from which they were procuring large quantities of natural gas, and that appellant was producing from its wells about 2,000,000 cubic feet of gas per day, to the city of Richmond, which was being transported through a system of pipes, under the natural pressure of the gas, without the use of artificial means; that, in order to supply its customers in Richmond, it is necessary for appellant to deliver from 2,000,000 to 2,500,000 cubic feet of gas per day; that the natural gas pressure was sufficient to force through appellants' pipe-line a sufficient supply of gas to the city of Richmond in moderate weather, but was insufficient in extremely cold weather, and the natural pressure was gradually diminishing, and will continue to diminish as gas is consumed from the reservoir, until the gas pressure is not sufficient to carry an adequate supply of gas for the use of appellant's consumers without the aid of artificial devices; that the natural gas pressure will con-

tinue to decline because of the consumption of gas until in the near future only a small part of the gas required for appellant's customers can be delivered without the aid of such artificial devices; that it is the intention of appellant to operate these pumps and compressors whenever the weather is such that an adequate supply of gas can not be delivered to its customers by the natural pressure of gas through its pipes, which will hereafter be a large portion of the year, on account of the diminishing natural pressure.

The seventeenth finding is as follows: "That said natural gas pumps or compressors are so constructed and geared that they may be run either at a high or low speed, the amount of gas which the same will handle being regulated by the speed at which the said compressors are so operated; that said compressors can be so operated as to take all or any part of the gas supplied to the same, provided the quantity or volume of gas so supplied to said pumps or compressors does not exceed the maximum capacity of the same, but that whenever the quantity of gas supplied to said pumps or compressors exceeds the maximum capacity of said pumps, or exceeds the volume of gas being carried forward by said pumps at any given time, the effect of such excessive supply is partially to dam or back up said gas in the pipes supplying said compressors, so as to retard the flow thereof in the said pipes, and cause what is known as 'back-pressure' in said supply pipes, and in the wells connected therewith."

It is further found that when this case was tried the combined natural flow of gas from appellant's wells was in excess of 29,000,000 cubic feet per day; that all of the wells are connected with one main line to the intake of the pumps and compressors; that the wells are so connected that the gas in the pipe-lines, with their entire natural flow, can be, and is, carried to the pumps by the natural pressure of the gas, except as the same is retarded by the friction of

the pipes, but that this friction is such that, while more than 29,000,000 cubic feet of gas per day will naturally flow from the wells to the surface of the ground, between 16,000,000 and 17,000,000 cubic feet of gas, only, will be carried through the system of pipes to the point where the pumps are located by the natural pressure of the gas flowing from the wells; that the friction of the pipes is so great that, with the entire output of the wells flowing into the pipes, only about 2,000,000 cubic feet will be delivered at Richmond, without the aid of artificial devices; that there will naturally flow from appellant's wells through its pipe-line to the pumps about three-fifths of the entire natural flow from the wells at the surface of the ground, the flow being retarded by the friction of the pipes so that the other two-fifths is held back in the wells, and that only about one-fifteenth of the natural flow will be carried to Richmond without the aid of artificial devices.

The nineteenth finding is as follows: "That the natural pressure of gas when flowing from the mouth of defendant's wells, unretarded by any valves or other artificial devices, does not exceed two or three pounds per square inch in the largest of said wells, grading downward to less than one pound to the square inch in the smallest of said wells; but that said wells, all being connected with the same line of pipe leading into said gas compressors, maintain practically an equal amount of back-pressure so long as the quantity permitted to flow into said pipes for transportation is less than the quantity carried to said pumps on the intake side thereof, by said pipe-line leading to the same; the qualities, character, and expansive power of natural gas being such as to equalize the pressure at all points in any given system of wells, pipes, and reservoirs connected with each other, except as said pressure may vary on account of the different degrees of friction at various points in said system, so that whenever any back-pressure is maintained in defendant's said pipe-line, supplying

its said pumps or compressors, on the intake side thereof, a slightly greater back-pressure will be maintained in each of the wells connected with said pipes than in said pipe on the intake side of the pumping-station, varying in each case as the distance is greater or less from each of said wells to said pumping-station; the back-pressure increasing with the distance to each of the said wells, and corresponding with the loss due to friction in each case."

That it is the intention of appellant to maintain at all times a sufficient number of wells to produce naturally a volume of gas largely in excess of the amount required for its consumers, and take only a portion of the natural flow at any given time, and to maintain in each of the wells and in the lines a considerable back-pressure, and that it is appellant's intention to maintain a sufficient number of wells producing naturally a sufficient volume of gas to deliver naturally to the pumps a much larger quantity of gas than is necessary to supply its customers, in order that it may at all times maintain on the intake side of the pumps a considerable back-pressure, and thereby retard and confine in the wells a portion of the natural flow of each, so as to prevent the entrance of salt water therein; that at no time has it been or is it appellant's intention to permit the entire natural flow from its wells to be taken by means of pumps or compressors; that it is necessary for the preservation of appellant's own property that a portion of the natural flow be held back, and appellant has intended at all times to hold back a portion of the natural flow, by creating and maintaining back-pressure on the intake side of its pumps, and permit only a portion of the combined natural flow of each well to flow into its pumping-station, and be transported therefrom.

It is further found that the use of pumps will have the effect of increasing the flow from the point where the pumps are located to the city of Richmond, beyond what would naturally flow to that point, by increasing the pres-

sure of gas, and releasing the same on the outflow side of the pumps at such increased pressure, and, as a consequence thereof, increasing the velocity at which the gas would flow from the pumps to the point of consumption; that, by the use of the pumps, appellant would get a larger per cent. and proportion of gas from the common reservoir than it could or would get without the use of pumps and by the natural rock pressure.

The first section of the act of March 4, 1891 (Acts 1891, p. 89, §7507 Burns 1901) provides that natural gas "shall not be transported through pipes at a pressure exceeding 300 pounds per square inch, nor otherwise than by the natural pressure of the gas flowing from the wells." Section two (§7508) provides that it shall be unlawful "to use any device for pumping or any other artificial process or appliance for the purpose, or that shall have the effect of increasing the natural flow of natural gas from any well, or of increasing or maintaining the flow of natural gas through the pipes used for conveying and transporting the same." The third section (§7509) provides a penalty, and that parties "may be enjoined from conveying and transporting natural gas through pipes otherwise than in this act provided."

We can not agree with counsel for appellees that the legislature, by this statute, has conclusively determined that the effect of the use of pumps is necessarily injurious, and has absolutely prohibited their use. Appellees' case is not made out by merely showing the use of pumps for the purpose of transportation. The use of pumps or compressors for such purpose is not *ipso facto* unlawful. The constitutional validity of the statute is not questioned. Appellant's position is that the statute can not be so construed as to permit transportation at a natural pressure of 300 pounds per square inch, and yet deny the right to transport by artificial means at a pressure much lower than 300 pounds per square inch. This position is sustained by the

Supreme Court in *Jamieson* v. *Indiana Nat. Gas, etc., Co.,* 128 Ind. 555, 12 L. R. A. 652. That case holds that this statute was enacted for the purpose of protecting persons and property from the inflammable and explosive character of gas in transit, and fixing the maximum pressure at 300 pounds per square inch, at which it may be transported, whether by the natural or by artificial pressure.

And in *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 156 Ind. 679, appellants unsuccessfully sought to enjoin appellees from transporting gas from their wells at a pressure in excess of the natural rock pressure, and by means other than the natural pressure. The court in that case said: "The provisions of the section in question in this case can be enforced at the suit of a private person only where such person can show that he sustains, or is likely to sustain, some special injury, or that he or his property is exposed to some particular damage, which this statute was intended to prevent. The appellants present no such case. It is not averred that their property is endangered by the alleged wrongful acts of the appellee, nor does it appear that they are likely to sustain any special injury peculiar to themselves in consequence of the violation of the act by the appellee." See, also, *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 155 Ind. 545; *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 155 Ind. 566.

It is manifest from the above holdings that appellees would not be entitled to injunctive relief by merely showing the fact of the use of pumps for the purpose of transporting gas. Nor would they be entitled to such relief by showing that they are injured because the gas is being wastefully diminished by the use of the pumps. "The act does not directly, nor indirectly, attempt to prevent waste of the gas." *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 156 Ind. 679. We think it is perfectly clear that the complaint in this case is not sufficient to

charge against appellant improper methods of transportation.

However, injunction will lie to prevent the use of devices for pumping, and employing artificial processes or appliances for the purpose or having the effect of increasing the natural flow of gas from the wells. *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 155 Ind. 461, 50 L. R. A. 768.

It is no longer an open question in this State that natural gas, when reduced to possession, becomes private property, and is a commercial commodity, which the owner may dispose of in whatever manner he may consider most advantageous. *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 155 Ind. 545; *State, ex rel.,* v. *Indiana, etc., Mining Co.,* 120 Ind. 575, 6 L. R. A. 579; *Jamieson* v. *Indiana Nat. Gas, etc., Co., supra; Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 44 L. Ed. 729, 20 Sup. Ct. 576. Whatever gas, through natural causes, rises to the surface of the ground through the wells of an individual owner, and is carried by such natural forces into tanks, pipe-lines, or other receptacles of such owner, becomes absolutely his property. The only limitation upon such owner taking the gas is the manner in which he shall take it from the wells. As is said in *Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,* 155 Ind. 461, 50 L. R. A. 768, "Natural gas in the ground is so far the subject of property rights in the owners of the superincumbent lands, that while each of them has the right to bore or mine for it on his own land, and to *use such portion of it as when left to the natural laws of flowage may rise in the wells of such owner and into his pipes,* no one of the owners of such lands has the right, without the consent of all the other owners, to induce an unnatural flow into, or through, his own wells, or to do any act with reference to the common reservoir, and body of gas therein, injurious to, or calculated to destroy it." And it is held that the statute in question does not

create any new remedy in favor of an owner in common
of undeveloped gas, who shows that he will sustain some
special injury by reason of the act of another of the com-
mon owners which might work to the injury or destruction
of the common source from which the gas is drawn. An
action would lie in such case independently of the statute.
*Manufacturers Gas, etc., Co.* v. *Indiana Nat. Gas, etc., Co.,*
156 Ind. 679; *Manufacturers Gas, etc., Co.* v. *Indiana
Nat. Gas, etc., Co.,* 155 Ind. 461, 50 L. R. A. 768.

The sole question here is whether the special findings
show that the use of the pumps and compressors will work
such injury to appellees, by increasing the flow of gas from
the wells, as entitles them to injunctive relief. It is a
property of gas, that, while easily compressed, it is always
ready to expand and occupy more space. This expansive
force or tension imparted to it by some pressure brings it
through the wells to the surface and into pipes or other
receptacles. The quantity of gas that this expansive force
or tension, overcoming the atmospheric pressure, will
bring to the surface, and into the pipes or receptacles, is
the natural flow of the wells. The natural import of the
term "natural flow," as used in the statute, necessarily
means the entire volume of gas that will issue from the
mouth of a well when retarded only by the atmospheric
pressure. If certain wells will bring into a receptacle at
the surface 1,000,000 feet of gas per day, that is their nat-
ural flow. Suppose a valve in this receptacle permits one-
half this volume to pass into pipes to consumers. Opening
an additional valve, and permitting one-half the balance to
pass from the receptacle to other consumers, does not in-
crease the natural flow, in the sense in which the term is
used in this statute. With the additional valve a greater
portion of the natural output of the wells is taken, but the
natural flow of the wells has not been increased. And, as
illustrated in appellant's brief, suppose pumps are attached
to a well naturally producing 1,000 barrels of water per

day, for the purpose of forcing 500 barrels daily to a higher altitude, in order that it may be utilized. Although the water flowed from the well into a main to which the pumps were attached, and the total output put under control, it could not be claimed that the natural flow of the well had been increased by the use of the pumps in carrying half the natural flow to a place for convenient distribution.

It must be conceded that appellant has the right to use all the gas that naturally comes through its wells to the surface of the ground. When we speak of this as "the natural flow of the wells," we necessarily mean the total output of the wells from natural causes. The term "natural flow," as used in the statute, can be given no other reasonable meaning. An artesian well from which flows 1,000 barrels of water daily has a natural flow of 1,000 barrels daily. And so it is with gas-wells. Increasing this natural flow of gas or this total output of the wells from natural causes is the thing that is prohibited, and so long as the appliances take less than this natural flow, as thus understood, it can not be said that they have increased the natural flow. Upon the facts found all the gas that goes into the pumps on the intake side goes in by reason of its own expansive force or tension. This expansive force or tension must necessarily exist so long as back-pressure is maintained at the pumps. The court finds that this back-pressure was to be maintained at all times by appellant in the operation of its pumps and compressors, and that at no time has it been or is it appellant's intention to permit the entire natural flow from its wells to be taken by the pumps. Unless the pumps were so operated as entirely to remove this back-pressure and create suction in the wells, it could not be said that they would increase the natural flow or natural output of the wells. From the facts found the only effect of the use of the pumps is to

decrease the force of this back-pressure, but this the statute does not prohibit.

It is true that through the use of the pumps a greater portion of the natural flow or total natural output of the wells will be taken than would be taken without their use, and that the back-pressure in the wells will be correspondingly decreased. But the statute does not require that only a certain portion of the gas coming naturally from a well can be used, and that a certain portion shall be held back. Nor does the statute require that a certain amount of back-pressure, or that any back-pressure, shall be maintained. It can not be denied that appellant might lawfully dispose of the total product of its wells to consumers near the wells, and the total natural flow be consumed by them, without maintaining any back-pressure in the wells.

We find nothing in this statute which requires us to say that, although the 100,000 feet of gas produced naturally by A's well is A's property, and a like amount so produced by B's well in the same vicinity is B's property, that A may use this total output in his factory at the mouth of his well, and B must be denied the use of the output of his well in his factory ten miles distant, because the natural pressure is insufficient to carry it that distance. While the court found, as an ultimate fact, that the use of the pumps has the effect of increasing the general flow of gas from the wells, it also found the primary facts from which it appears that the use of the pumps would not increase the amount of gas coming from the wells through the natural laws of flowage. In such case the ultimate fact will be disregarded on appeal. "Where the primary facts," said the court in *Smith* v. *Wells Mfg. Co.*, 148 Ind. 333, 342, "are stated and they lead to but one conclusion, the statement of the ultimate fact will be disregarded, since a statement of the ultimate fact is required only where, from the primary facts, either of two conclusions may reasonably be drawn. *Cincinnati, etc., R. Co.* v. *Grames*, 136 Ind. 39; *Smith*

v. *Wabash R. Co.,* 141 Ind. 92; *Board, etc.,* v. *Bonebrake,* 146 Ind. 311."

Judgment reversed, with instructions to state a conclusion of law in appellant's favor.