SCHENK *v.* CITY OF ANN ARBOR.

1. WATERS AND WATER COURSES—PERCOLATING WATERS—RIGHT OF
   LANDOWNER—LEGAL RIGHTS—EQUITABLE RIGHTS.
   Although the owner of land has a legal right to sink wells
   thereon and use the water therefrom supplied by percola-
   tion in any way he chooses to use it and to allow it to flow
   away, even though he thereby diminishes the water in his
   neighbor's wells or dries them entirely, yet such right is
   qualified in equity and he is equitably entitled to only a
   reasonable use of such water under all existing conditions.[1]

2. SAME—MUNICIPAL CORPORATIONS.
   Although the owner of land is a city seeking to supply its
   inhabitants with water it is not entitled to greater rights
   to the use of water on such land supplied by percolation
   than a private party owning land would have.

3. MUNICIPAL CORPORATIONS—DIVERSION OF PERCOLATING WATERS—
   DAMAGES TO ADJOINING OWNERS—REMEDY.
   Where the owner of land brought an action against a city
   to recover damages for injury to the water supply of wells
   on his land due to wells on lands in the vicinity owned
   by the city from which the city pumped large quantities
   of water and on which it was preparing to erect water-
   works for supplying the city, located three miles away on
   other lands, with large quantities of water from the land in
   question, and to enjoin such proposed waterworks, a de-
   cree allowing plaintiff damages for injuries sustained and
   refusing an injunction, was proper, but should be modified
   to permit plaintiff to apply for further relief for future
   injuries. KUHN, C. J., and STEERE and BROOKE, JJ., dis-
   senting.

Appeal from Washtenaw; Kinne, J. Submitted Oc-
tober 12, 1916. (Docket No. 137.)   Decided May 31,
1917.

Bill by Gustave A. Schenk against the city of Ann
Arbor for an injunction restraining defendant from

[1]On correlative rights in percolating water, see notes in 64 L.
R. A. 236; 17 L. R. A. (N. S.) 465; 23 L. R. A. (N. S.) 331;
25 L. R. A. (N. S.) 465; 37 L. R. A. (N. S.) 193.

taking water from property adjoining plaintiff's lands. From the decree entered, both parties appeal. Modified, and affirmed.

*Arthur Brown,* for plaintiff.

*Frank P. Devine* (*A. F. Freeman* and *John P. Kirk,* of counsel), for defendant.

OSTRANDER, J. The demand of the inhabitants of the city of Ann Arbor for water for domestic and other purposes exceeds 3,000,000 gallons daily. The municipality owns and operates the water plant supplying water to the inhabitants. Its present used sources of supply are wells, some springs, and the Huron river, which flows through the city. It is dissatisfied with the quantity and the quality of water thus available for the use of the city and its citizens. The charter of the city in terms grants the power to purchase, erect, and maintain grounds and buildings, within or not exceeding three miles outside of the limits of the city, for waterworks. Act No. 331, Local Acts of 1889, as amended by Act No. 658, Local Acts of 1907. South, and some three miles distant from the city, is a considerable tract of marsh land, underlying which is a large bed of water-bearing gravel, within easy reach of the surface of the ground, and there are also two other beds of gravel lower down, one 80 and the other 140 feet below the surface, each of them containing water. Underlying this region, the formations are so distributed, to use the language of a witness:

"That there is a slope for the underground water from the western part of Washtenaw towards Lake Erie, and what is true of this region is true all the way from Hillsdale county northerly to the headwaters of the Huron river up in Oakland county, so that the area that lies between the western part of Washtenaw county and the Steere farm has a slope to the southeast, a general slope to the southeast, and a general

drainage to the southeast, and a general underground flowage to the southeast. This is the natural result of the conditions prior to the deposition of the glacial deposits. * * * The gravel deposits are very homogeneous. There is a great deal of fine marl, with clay in it. Traversing this are beds of gravel and sand that we find exposed, and these are found at various levels. These gravel deposits are in the neighborhood of 200 feet thick; in Lodi township they exceed 250 feet; and in the vicinity of the Steere farm they exceed 1,350 feet. Because of the great thickness of the gravel deposits there are running through these deposits at various levels various channels, so that in sinking wells it is not a difficult matter in this region to obtain a considerable supply of water, so that there are hardly any farmers in this neighborhood, I gather, who were unsuccessful in obtaining water; if not within a few feet of the surface, they could by going deeper. * * * The contributing area would come in through these western townships of the county—from Dexter, Lima, and Freedom townships, and part of Sylvan and the townships to the west. They would contribute to this underground water, the natural flow of this area in this way, and this is demonstrable from the records of the wells I have obtained through the intervening area."

As early as the year 1910 attention was directed to this possible source of a water supply for the city, and in the year 1912 and thereafter tests were made to determine the quantity of water procurable. There were a number of small wells upon the marsh from which water was flowing. Other wells were driven, five 8-inch wells, and later another 8-inch and a 12-inch well, being put down by the city, to an average depth of about 30 feet. As many as 715,000 gallons of water flowed freely from the first five 8-inch wells, and from seven wells the daily flow was 866,200 gallons, a quantity which was materially increased by the use of a pump. In the year 1915 the city constructed upon the land a well 16 feet in diameter, from which it pumped water from May 12th until July 5th, the pumping being

fairly continuous, day and night, although for various reasons, pumping was for short periods of time interrupted. The result was from 3,700,000 to 3,800,000 gallons of water daily. The pumping lowered the water in the well from a point above the level of the ground to within three feet of the bottom of the well. At some time, before or after the tests were begun, the city bought and owns 130 acres of the land, including that upon which the test wells were constructed. Upon this land it desires to erect a costly pumping station, pump the water therefrom, force it to the city, and distribute it to the inhabitants.

It is the theory of the city, which its testimony, and especially its opinion evidence, tends to support, that it can for an indefinite period take from the wells upon this land a quantity of water, approximating 4,000,000 gallons daily, without lowering the head of the underground water, or the water table, more than it was lowered during the tests it has conducted. It is its theory, also supported by its opinion evidence, that the water in the water-bearing gravel reached by its wells does not, by its presence in the earth, by sepage or percolation, affect agriculture upon or over or near to the particular tract of land; that it is from rains, and not from percolation or seepage from the subterranean body of water, that agriculture is supplied with required moisture.

The plaintiff, and, it appears, other land-owners, upon the marsh and on higher land, contend, and offer testimony to support the contention, that as a result of the pumping operations wells in the vicinity have gone dry, flowing wells upon the marsh have ceased to flow or flow a diminished quantity of water, and that the agricultural productiveness and value of land for a half mile in every direction from the large well of the city will be unfavorably affected by continued pumping of water from the city's property. The testimony

for the plaintiff tends to prove that, when the city be-
gan to pump water from the large well, the water in
plaintiff's well, 200 rods north and west from the city
well, was 4 feet deep, and lowered at the rate of about
a foot a week during the first two weeks, and there-
after an inch a day for a week, and then one-half inch
a day, until there was no water left in the well. When
the pumping ceased, the water returned at the rate of
one-half inch a day, and at the time of the hearing there
were 40 inches of water in the well. While the pump-
ing was continued, plaintiff was obliged to get water
from a neighbor and to draw water in a tank from the
county ditch for his stock. Upon another farm of 234
acres, east and across the road from the plaintiff's
farm, were two wells, one dug at the house and one at
the barn, and two flowing wells in the fields for the
use of stock. The well at the house had been dug more
than 50 years, and had always furnished sufficient
water for domestic use. The water in this well was
lowered during the pumping, so that no water could be
pumped from it, and after the pumping ceased the
water in the well did not return. The well at the barn
was affected in a similar way. The flowing wells upon
this farm were about three-quarters of a mile north
and west of the large well put down by the city. From
one of them the water ceased to flow at all, and from
the other only a small quantity ran away, and at the
time of the hearing the flow of water had returned, in
one well not at all and in the other only in reduced
quantity. Upon another farm south of plaintiff's land,
and west of the land owned by the city, was a flowing
well, a mile from the large well owned by the city. It
was a 3-inch well, and before the pumping began had
flowed a stream of water two-thirds the size of the
pipe. The flow was almost entirely cut off while the
pumping was carried on, and after it ceased about one-
half of the original flow returned.

In various directions, and at various distances from the test wells, wells and property, it is claimed, were affected by the pumping operations, and a number of the owners of property began actions against the city, seeking to restrain the further taking of water from the wells, charging various resulting injury, temporary and permanent, to the land, occasioned by the taking of this large quantity of water from the earth. One of these cases was heard in the court below on demurrer to the bill of complaint, and from the decree which was entered an appeal was taken. *Osborn* v. *City of Ann Arbor*, 189 Mich. 96 (155 N. W. 1102). We declined to determine, upon demurrer, the questions which were presented. In the case at bar the plaintiff dug his well deeper, and secured a supply of water. The learned trial judge concluded that an injunction ought not to be continued, and that plaintiff should be satisfied with a decree for such damages as had resulted from his apparent ascertainable injury. From a decree granting such relief, both parties have appealed.

If the court might accept as final what the parties decline to so accept and act upon, the opinions of gentlemen having special extra knowledge of the subject that the taking of 3,000,000 gallons and more of water from the city wells for an indefinite period will produce no other or greater injury to other owners of land than was produced by the tests which were made, the question whether such use was a reasonable use would be, perhaps, presented for decision. It is obvious, however, that no judicial guarantee can be given that experience will sustain the contentions of either party respecting the results of continued pumping of the water. Under the circumstances, the important question which is involved, namely, whether the court will enjoin the city from further contemplated use of the water, can be answered only by con-

sidering what are the rights of the parties. There are some ascertainable controlling facts, and upon them and applicable rules of law a conclusion must be based.

The controlling ascertainable facts may be briefly stated. The parties do not occupy the position of riparian owners. If there was (I think there is not) occasion to aid the testimony by presumption, the presumption necessarily employed would be that the waters in the particular gravel deposit are percolating waters, and not subterranean waters flowing in a defined channel, or contained in an underground lake or pond. Defendant city does not propose to use only the volume of water flowing naturally from its wells; it has augmented, and proposes to augment, that flow by artificial means, by pumps, by which means it will draw to its lands waters out of the surrounding lands, lowering over a considerable area the head of water naturally carried in the gravel. Existing flowing wells, the waters from which are used for the irrigation of crops suitable to be grown in the marsh, will cease to flow, and agriculture be thus, to some extent, directly affected. It proposes to use none, or at most only an inconsiderable, part of the water upon, or for the benefit of, the land from which it takes it, or for its own benefit as landowner; on the contrary, its purpose is to pipe the water away from the land, to sell some of it, to use some of it for municipal purposes, not to return any of it to the land. It cannot be now ascertained whether in time agriculture—surface conditions of land in the vicinity of the well or wells—will be affected injuriously by the continued drawing off of the underground water.

Under such circumstances, the right of the landowner, to the injury or detriment of other landowners, to take from his own land such percolating waters

196—Mich.—6.

as he may thus be able to collect, is not an unqualified, but is a qualified, right. The letter of the law, as it has been expounded in many cases in England and America, affirms the right of the owner of land to sink wells thereon, and use the water therefrom, supplied by percolation, in any way he chooses to use it, to allow it to flow away, even though he thereby diminishes the water in his neighbor's wells or dries them entirely, and even though in so doing he is actuated by malice. Such a right has been held a property right, which cannot be taken away or impaired by legislation, unless by the exercise of the right of eminent domain or the police power. *Huber* v. *Merkel,* 117 Wis. 355 (94 N. W. 354, 62 L. R. A. 589, 98 Am. St. Rep. 933). See *Acton* v. *Blundell,* 12 Mees. & W. 324; *Chasemore* v. *Richards,* 7 H. L. Cas. 349; *Houston & Texas Cent. R. Co.* v. *East,* 98 Tex. 146 (81 S. W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Am. & Eng. Ann. Cas. 827); *Frazier* v. *Brown,* 12 Ohio St. 294. In *Pixley* v. *Clark,* 35 N. Y. 520 (91 Am. Dec. 72), the common-law doctrine was accepted in this language:

"An owner of the soil may divert percolating water, consume or cut it off, with impunity. It is the same as land, and cannot be distinguished in law from land. So the owner of the land is the absolute owner of the soil and of percolating water, which is a part of, and not different from, the soil. No action lies against the owner for interfering with or destroying percolating or circulating water under the earth's surface."

While this is the rule applied, and to be applied, in respect to most of the ordinary uses of land, and the ordinary operations carried on upon and in land, there is other doctrine, apparently, but not strictly, a modification of the early common-law doctrine referred to, which is sometimes called the doctrine of reasonable user, and which was introduced by equity to the law. The distinction between the rules and the reasoning

upon which each is based is stated, very much to my own satisfaction, by Chancellor Pitney in *Meeker* v. *City of East Orange,* 77 N. J. Law, 623 (74 Atl. 379, 25 L. R. A. [N. S.] 465, 134 Am. St. Rep. 798), in an opinion approved by each of the members of the court of errors, from which opinion I take the following:

"The English rule seems to be rested at bottom upon the maxim, '*Cujus est solum, ejus est usque ad cœlum et ad inferos.*' Thus, in *Acton* v. *Blundell,* 12 Mees. & W. 354, Chief Justice Tindal said that the case fell within 'that principle which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure.' Here the impracticability of applying the rule of absolute ownership to the fluid, water, which by reason of its nature is incapable of being subjected to such ownership, is apparently overlooked. If the owner of Whiteacre is the absolute proprietor of all the percolating water found beneath the soil, the owner of the neighboring Blackacre must, by the same rule, have the like proprietorship in his own percolating water. How, then, can it be consistent with the declared principle to allow the owner of Whiteacre to withdraw, by pumping or otherwise, not only all the percolating water that is normally subjacent to his own soil, but also, and at the same time, the whole or a part of that which is normally subjacent to Blackacre? Where percolating water exists in a state of nature generally throughout a tract of land, whose parcels are held in several ownership by different proprietors, it is, in the nature of things, impossible to accord to each of these proprietors the absolute right to withdraw *ad libitum* all percolating water which may be reached by a well or pump upon any one of the several lots, for such withdrawal by one owner necessarily interferes to some extent with the enjoyment of the like privilege and opportunity by the other owners. Again, the denial of the applicability to underground waters of the general

principles of law that obtain with respect to waters upon the surface of the earth is in part placed upon the mere difficulty of proving the facts respecting water that is concealed from view. But experience has demonstrated in a multitude of cases that this difficulty is often readily solved. When it is solved in a given case, by the production of satisfactory proof, this reason for the rule at once vanishes. * * * Upon the whole we are convinced, not only that the authority of the English cases is greatly weakened by the trend of modern decisions in this country, but that the reasoning upon which the doctrine of 'reasonable user' rests is better supported upon general principles of law and more in consonance with natural justice and equity. We therefore adopt the latter doctrine. This does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation, or otherwise, nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted; but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it results therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses."

The earlier cases in New York repeatedly approved the rule laid down in *Acton* v. *Blundell* and *Chasemore* v. *Richards*, but in *Smith* v. *City of Brooklyn*, 32 App. Div. 257 (52 N. Y. Supp. 983), affirmed in 160 N. Y. 357 (54 N. E. 787, 45 L. R. A. 664), it was held that, whatever may be the rule with respect to the right of a landowner to use the water percolating through the earth, and thereby to affect the sources of wells or springs upon his neighbor's land, he may not divert and diminish the natural flow of a surface stream by

preventing its usual and natural supply, thereby causing, through suction or other methods, a subsidence of its waters. In that case, the action was brought to recover damages for the draining of a stream and pond upon plaintiff's premises. For many years the plaintiff had, by means of a dam, made a pond, and made use of it in connection with his farming operations, for the collection and sale of ice, and for boatbuilding purposes. The defendant, at a distance of some 2,400 feet from the pond, had constructed an aqueduct for the purpose of conducting water for its municipal purposes, which it did by wells and pumps upon its own land. The complaint was that the defendant drained the plaintiff's water course and pond, and evidence was offered tending to prove that the direct cause of the stream running dry was the draining of the territory by defendant's construction of its system of conduits, wells, and pumps, and the use of suction. The verdict of the jury sustained the contention of the plaintiff, and a judgemnt upon the verdict was sustained, upon the ground that the water of a natural surface stream is for the benefit of all the riparian owners, and that to divert or to diminish its flow in any way is an interference with a natural right, which gives rise to an action for the injury.

In *Forbell* v. *City of New York*, 164 N. Y. 522 (58 N. E. 644, 51 L. R. A. 695, 79 Am. St. Rep. 666), determined in November, 1900, a perpetual injunction was granted restraining the city of New York from operating its engines, driven wells, and pumping stations, known as the "Spring Creek pumping station," in the borough of Queens, and awarded past damages to the plaintiff in the sum of $6,000. The plaintiff was the lessee of certain farm lands situated near Spring creek, and he used a portion of the lands for the purpose of growing celery and water cresses. The city of Brooklyn constructed a pumping station in

the place in question in 1885, and in 1894 sunk additional wells and made an additional pumping station. The effect of pumping at this station was to lower the underground water table on this land, and thus made it unfit for the cultivation of celery and water cresses, and the crops failed for several years prior to the commencement of the action. In affirming the judgment, the court of appeals said:

"It may be conceded that the letter of the law, as expounded in many cases in this State, denies liability [citing numerous cases]. The earlier cases followed the law as stated in *Acton* v. *Blundell*, 12 Mees. & W. 324, and *Greenleaf* v. *Francis*, 18 Pick. [Mass.] 117. So far as the extraction or diversion of underground water upon the land of one proprietor affects no surface stream or pond upon the neighboring land, but simply the underground water therein, the rule is still adhered to."

But, in argument, after stating the reason for the English rule, the court used the following language:

"In the cases in which the lawfulness of interference with percolating waters has been upheld, either the reasonableness of the acts resulting in the interference, or the unreasonableness of imposing an unnecessary restriction upon the owner's dominion of his own land, has been recognized."

In *Hathorn* v. *Gas Co.*, 194 N. Y. 326 (87 N. E. 504, 23 L. R. A. [N. S.] 436, 128 Am. St. Rep. 555, 16 Am. & Eng. Ann. Cas. 989), the object of the suit was to restrain the appellant, the gas company, from using pumps and other apparatus for the purpose of accelerating and increasing the flow of subterranean percolating water and gas through deep wells which it had sunk upon its premises in the town of Saratoga Springs; the plaintiffs contending that in their complaint they set forth a cause of action both at common law and under the provisions of the statute of New

York for the protection of the natural mineral springs of the State and to prevent waste and impairment of its natural mineral waters. It was heard and determined upon demurrer to the complaint. From the prevailing opinion delivered by Hiscock, J., I take the following:

"I shall endeavor first to apply to the pleading thus attacked the test of common-law principles, and the question whether measured by them it does set forth a cause of action may be stated in a more concrete form applicable to the specific facts involved in this action. Thus stated, it will be whether a landowner has the right by the use of pumps and other apparatus greatly to accelerate and increase the natural flow of subterranean percolating mineral waters and gas through deep wells bored into a widely extended common supply of such substances, not for any purpose connected with the enjoyment of his lands, but for the purpose of procuring from the waters a supply of gas to be marketed throughout the country, and with the result of wasting great quantities of mineral waters, and of destroying or impairing the natural flow of such waters and gas in and through the springs of other landowners throughout a large area, and of destroying or impairing the valuable character of such waters for the purposes for which they have been habitually used.

"The earlier decisions in this and other States laid down the general rule that a landowner might not be enjoined from doing an act on his own premises which resulted in diverting or even wholly destroying the flow of percolating waters from or upon his neighbor's lands. *Ellis* v. *Duncan*, 21 Barb. [N. Y.] 230; *Pixley* v. *Clark*, 35 N. Y. 520 [91 Am. Dec. 72]; *Trustees of Village of Delhi* v. *Youmans*, 45 N. Y. 362 [6 Am. Rep. 100]; *Bloodgood* v. *Ayres*, 108 N. Y. 400 [15 N. E. 433, 2 Am. St. Rep. 443]; *Haldeman* v. *Bruckhart*, 45 Pa. 514 [84 Am. Dec. 511]; *Greenleaf* v. *Francis*, 18 Pick. [Mass.] 117; *Frazier* v. *Brown*, 12 Ohio St. 294.

"In thus holding they but followed the rule laid down in the leading case of *Acton* v. *Blundell*, 12 M. & W. 324, 354, wherein was approved the principle

'which gives to the owner of the soil all that lies beneath his surface; * * * that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of *damnum absque injuria*, which cannot become the ground of an action.'

"It will hardly be profitable to consider all of the different reasons which led the courts to adopt these principles, but it is important to bear in mind that they were invariably applying them to cases in each of which the party complained of had interfered with the enjoyment by another of percolating waters by some act which was directly and naturally connected with the improvement or enjoyment of his own land. Thus, in the *Acton Case*, the act which resulted in the interference complained of consisted in mining operations on a man's own land. In the case of *Ellis* v. *Duncan*, the person intercepting the flow of percolating waters on his neighbor's land had done so by digging a trench or ditch and opening a quarry on his premises. No question was presented in these cases of a landowner depleting or exhausting a common supply of underground waters by artificial methods for purposes not in any way connected with the enjoyment or use of his own lands.

"But with the increased demands upon natural resources, such as water, this question did begin to arise. It seems to have been first suggested in England in the case of *Chasemore* v. *Richards*, 7 H. L. Cas. 349. There the question arose whether the flow of percolating waters on another's land might be diverted or destroyed by pumping for purposes of supplying a municipality with water, and while it was finally held that this might be done, it was only after the right had been seriously questioned.

"In this State it was first discussed, though not actually involved, in *Smith* v. *City of Brooklyn*, 18 App. Div. 340 [46 N. Y. Supp. 141], and it was there stated by Judge Hatch that the right in this State had never 'been upheld in the owner of land to de-

stroy a stream, a spring, or well upon his neighbor's land, by cutting off the source of its supply, except it was done in the exercise of a legal right to improve the land, or make some use of the same in connection with the enjoyment of the land itself, for purposes of domestic use, agriculture, or mining, or by structures for business carried on upon the premises.'

"Finally, in the case of *Forbell* v. *City of New York*, 164 N. Y. 522, 526 [58 N. E. 644, 51 L. R. A. 695, 79 Am. St. Rep. 666], the question reached this court, and the necessity was recognized, not for an alteration of the rules which had been applied by earlier cases to the facts then presented, but, rather for an enlargement and extension of such rules, so that they would be applicable to new conditions. That case for the first time in this State at least laid down the rule of the reasonable use of percolating waters which I think is applicable to and controlling of the facts in this case. There the city of New York tapped waters, percolating under some lands purchased by it, and which were part of a connected system or supply extending over a large area, and then by powerful apparatus so forced the flow of this water as to exhaust the supply which had formerly supplied plaintiff's land, and this was done for the purpose of furnishing a supply of water for the defendant. The court, reviewing many earlier cases passing upon the right of a landowner to enjoy the subsurface waters under his premises said:

"'In the cases in which the lawfulness of interference with percolating waters has been upheld, either the reasonableness of the acts resulting in the interference, or the unreasonableness of imposing an unnecessary restriction upon the owner's dominion of his own land, has been recognized.

"'In the absence of contract or enactment, whatever it is reasonable for the owner to do with his subsurface water, regard being had to the definite rights of others, he may do. He may make the most of it that he reasonably can. It is not unreasonable, so far as it is now apparent to us, that he should dig wells and take therefrom all the water that he needs in order to the fullest enjoyment and usefulness of this land as land, either for purposes of pleasure, abode, productiveness of soil, trade, manufacture, or for whatever else the land as land may serve.' He may consume it, but must not discharge it to the injury of

others. But to fit it up with wells and pumps of such pervasive and potential reach that from their base the defendant can tap the water stored in the plaintiff's land, and in all the region thereabout, and lead it to his own land, and by merchandising it prevent its return, is, however reasonable it may appear to the defendant and its customers, unreasonable as to the plaintiff and the others whose lands are thus clandestinely sapped, and their value impaired.'

"The principles thus adopted in the *Forbell Case* have been fairly upheld in the courts of other States. *Gagnon* v. *French Lick Springs Hotel Co.*, 163 Ind. 687 [72 N. E. 849, 68 L. R. A. 175] ; *Richmond Nat. Gas Co.* v. *Enterprise Nat. Gas Co.*, 31 Ind. App. 222 [66 N. E. 782] ; *Willis* v. *City of Perry*, 92 Iowa, 297 [60 N. W. 727, 26 L. R. A. 124] ; *Katz* v. *Walkinshaw*, 141 Cal. 116 [70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35].

"The situation described by the complaint in this action is relatively of the same general character as that with which the court dealt in the case cited.

"One proprietor by artificial and unusual methods has so increased the flow of percolating waters and gas upon its lands that it is obtaining a greatly increased proportion of a common supply at the expense of its neighbors, and it is doing this in order to supply a public market for a portion of these products while the others are wasted. The only important feature distinguishing the cases is the element of waste present in this one and absent in the earlier one.

"If these facts, resting now merely on the allegations of a pleading, shall be established by evidence, the trial court will in my opinion be fully authorized to draw the conclusion that they disclose a case of unreasonable and improper conduct by the appellant in the premises, and make out in favor of respondents a sufficient cause for appeal to and relief by a court of equity."

See, also, *People* v. *Gas Co.*, 196 N. Y. 421 (90 N. E. 441).

In *Katz* v. *Walkinshaw*, 141 Cal. 116 (70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35), the maxim, *"Sic utere tuo ut alienum non lædas,"* is held

applicable as between adjoining users of percolating waters whenever justice requires its application; a headnote which fairly states the conclusion arrived at by the court being:

"Each owner of soil lying in a belt which becomes saturated with percolating water is entitled to a reasonable use thereof on his own land, notwithstanding such reasonable use may interfere with water percolation in his neighbors' soil; but he has no right to injure his neighbors by an unreasonable diversion of the water percolating in the belt for the purpose of sale or carriage to distant lands."

One reason given by the court, it is true, for the ruling, is that the common-law rule that percolating water belongs unqualifiedly to the owner of the soil, and that he has the absolute right to extract and sell it, is not applicable to the conditions existing in a State where artificial irrigation is essential to agriculture, and artesian wells in percolating belts are necessarily used for that purpose. Upon the general subject, see 30 Am. & Eng. Enc. Law (2d Ed.), p. 308 *et seq.* See, also, *Hart* v. *Aqueduct Corporation,* 133 Mass. 488; *Bassett* v. *Manufacturing Co.,* 43 N. H. 569 (82 Am. Dec. 179); *Swett* v. *Cutts,* 50 N. H. 439 (9 Am. Rep. 276).

I have said that, in view of the circumstances, the right of defendant to make use of the water is a qualified right. It is qualified by this rule of reasonable user, a rule quite in harmony with the provisions of Act No. 190, Pub. Acts 1889, and Act No. 107, Pub. Acts 1905. There is no apparent reason for saying that, because defendant is a municipal corporation, seeking water for the inhabitants of the city, it may therefore do what a private owner of the land may not do. The city is a private owner of this land, and the furnishing of water to its inhabitants is its private business. It is imperative that the people of the city

have water; it is not imperative that they secure it at the expense of those owning lands adjoining lands owned by the city.

It does not follow that the city may not reasonably make use, for the purpose intended, of a large volume of water from this land. I have stated the rule by which the rights of the city and other landowners must be determined. Manifestly the city must take the chances of experience. The decree will not be reversed, and an injunction granted to plaintiff, although it should be so modified as to permit plaintiff hereafter to apply to the court, upon the footing of the decree and upon new matter, for equitable relief. The court cannot know what action the defendant city will take in the premises. It is not now harming the plaintiff, and the decree secures to him compensation for such actual injury as he is shown to have suffered.

The decree, modified as indicated, will be affirmed, and no costs of this appeal will be awarded to either party.

STONE, BIRD, and MOORE, JJ., concurred with OSTRANDER, J.

BROOKE, J. (*dissenting*). I am unable to agree with the conclusion reached by my Brother OSTRANDER in this case. The final paragraph of his opinion leaves the door open to the defendant, the city of Ann Arbor, to proceed with the erection upon its property of an expensive pumping plant, use of which may thereafter at any time be enjoined by the court upon a showing that continuing damage results to plaintiff through such use. I think that the defendant should either be permanently enjoined from proceeding with the contemplated enterprise, at this time and upon the testimony in this record, or that injunctive relief should be denied, and the decree of the court below affirmed, by the terms of which plaintiff was awarded damages for

such injury as has already occurred and his right to recover for future damages preserved.

Inasmuch as the right of the public to an adequate supply of pure drinking water is paramount to private property rights, I am of opinion that the law in this State should be clearly enunciated as follows: That any municipality, requiring water for domestic or municipal purposes, may, under the authority granted by the legislature, procure such water from lands acquired by it for that purpose and that the resulting damage, if any, to adjacent landowners, must be borne by such municipality; such damages to be ascertained in gross and in a single action at law by the injured landowner. These views are not out of harmony with those expressed by the writer in the case of *Loranger* v. *City of Flint*, 185 Mich. 454 (152 N. W. 251), where the municipality was taking its water from a navigable stream upon which it was a riparian owner.

The decree of the court below should be amended to provide for the bringing of a single action at law against defendant by plaintiff for the recovery of his damages in gross.

KUHN, C. J., and STEERE, J., concurred with BROOKE, J. PERSON, J., did not sit.