## CANADA et al. v. CITY OF SHAWNEE.

No. 24873. Dec. 15, 1936.

Supplemental Opinion On Rehearing and Rehearing Denied Jan. 26, 1937.

Park Wyatt and Byron Lamun, for plaintiffs in error.

Randall Pitman, City Atty., and Reily & Reily, for defendant in error.

PHELPS, J. The defendant, city of Shawnee, purchased 70 acres of land some seven or eight miles from the city. The plaintiffs for 30 years or more have owned farms adjoining and near the defendant's 70-acre tract. The plaintiffs' farms and all of the surrounding country had always been abundantly supplied with clear, pure, cold water in wells and gushing springs. The supply of water was described as apparently inexhaustible.

For the purpose of augmenting its water supply the defendant city dug 12 wells on its 70-acre tract and equipped each well with a 7½ horse power motor and pump. Enormous volumes of water were thereby pumped from under the lands of the defendant and of plaintiffs, which water was by the defendant transported in pipe lines to the city and there sold to the inhabitants.

Soon thereafter the wells on all of plaintiff's lands went dry. The springs ceased to produce water. Plaintiffs had no water for their stock, or for irrigation, or household or personal uses. There was some evidence that the land itself, even that early, began to dry out, so that it became less productive. The overwhelming weight of the evidence was that the injury thereby inflicted upon plaintiffs was very real, substantial and irreparable.

The plaintiffs brought this action to enjoin the defendant from pumping its wells. The trial court denied them relief, and they appeal. The main argument on appeal involves the law of waters, the defendant contending that the rules thereof entitle it to draw as much water as it pleases from its own land, regardless of the effect on plaintiffs and their property.

In legal consideration subterranean waters are divided into two classes: (1) Percolating water, and (2) underground streams. Percolating waters are those which seep, ooze, filter, and otherwise circulate through the subsurface strata without definite channels. Underground streams are simply what their name implies: water passing through the ground beneath the surface in defined channels.

Different rules are ordinarily prescribed for the two classes of water. The cases and authorities are generally agreed that subterranean water will be presumed to be percolating water unless it is definitely shown to be of the other class. There was not such showing here, and the parties concede that this action is governed by the rules applicable to percolating water.

Often this class of water will be found in great abundance at shallow depths, due to an underlying hard strata which is immune to percolation. Its movements are induced probably more by gravity and porosity of the soil than by anything else, but it is unnecessary to consider the scientific phases of the subject further than to notice that artificially induced pressure or vacuity at any point in the saturated region will repel or attract water to or from that point throughout the entire water region.

The English or common-law rule concerning rights in percolating waters was first announced in the case of Acton v. Blundell (1843), 12 Mees. & W. 324, 152 Eng. Reprint 1223, 15 Mor. Min. Rep. 168. It is in effect in probably the majority of American states today. That rule is that rights in percolating waters are regarded as belonging to the owner of the freehold, like the rocks, soil, and minerals found there, and that such owner may, in the absence of malice, intercept, impede, and appropriate such waters while they are upon or beneath his premises, and make whatever use of them he pleases, regardless of the fact that his use cuts off the flow of such waters to adjoining land and deprives the adjoining landowner of their use.

At an early day, however, the courts expressed dissatisfaction with the common-law or English rule, and began applying what they called, variously, the rule of "reasonable use" or rule of "correlative rights" or the "American rule." The digests reveal that in those cases and states where the English rule was adopted the decisions, with a few exceptions, were promulgated prior to the year 1900, while those recognizing and using the rule of reasonable use, or American rule, are of more recent origin. It is further significant that in recent years six of the states (California, Florida, Indiana, New Jersey, New York, and Utah) which had formerly adhered to the English rule adopted the rule of reasonable use.

Stated generally, the rule of reasonable use is that each landowner is restricted to a reasonable exercise of his own rights and a reasonable use of his own property, in view of the similar rights of others. This does not mean that there shall be an apportionment of subterranean percolating water between adjacent landowners, for such a thing is often if not always impossible, and it was this same impossibility which gave rise to the English rule itself. The rule of reasonable use as to percolating water is merely the application of the same rule as it affects all property, for ownership of property does not vest one with

the right to injure his neighbor with or with the use of that property. If the rule of reasonable use should attempt in actual practice an apportionment of percolating water between adjacent landowners, it would but serve to illustrate the necessity of the English rule, and so it happens that the virtue of the rule of reasonable use lies not so much in its statement as in its application to concrete cases. The history of law is replete with illustrations of how a new rule was born from the unfair and unjust use of an existing rule; it was those who sought an unfair and unconscionable advantage from the English rule who necessitated a limitation on that rule, and, as we view it, the rule of reasonable use, as it is actually applied, is not a different rule from the English rule at all, but is merely a limitation thereon.

We spoke above of the fact that the rule of reasonable use is best illustrated in its application. As typical of the situations wherein it has been used, the New Jersey court had before it a case in which percolating water was forcibly being extracted from the land in large volumes and sold at a distance, resulting in drying up adjacent farms (Meeker v. East Orange, 77 N. J. L. 623, 74 Atl. 379, 25 L. R. A. [N. S.] 465, 134 Am. St. Rep. 798). The court said that the rule of reasonable use as applied to percolating waters

"does not prevent the proper use by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted, but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it thereby results that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses."

In Flanigan v. State, 183 N. Y. S. 934, 113 Misc. 91, it was held that there are no correlative rights in percolating waters, such waters being at the absolute disposition of the owner of the soil, **with the exception** that when such waters are extracted for use at a distance from and off the land from which they are derived, the rule of reasonable use is applied. An oft-cited case is Katz v. Walkinshaw, 141 Cal. 116, 74 P. 766, 64 L.

R. A. 236, 99 Am. St. Rep. 35, wherein it was held that one could not withdraw percolating water for purposes of sale if surrounding land was thereby deprived of water necessary for profitable enjoyment. It clearly appears from the cases that the American rule is used merely as a check upon the unreasonable use of the English rule; that few if any cases can be found where American courts have denied a landowner the right to draw as much percolating water from under his land as he needs, even though it hurts his neighbor, so long as the use to which he puts it bears some reasonable relationship to the natural use of his land, and even though such use of the land be industrial and not agricultural. But the majority of recent decisions stop short at and forbid the harmful extraction of percolating water for sale at a distance. As stated in the annotation at 55 A. L. R. 1404:

"Practically all the cases in which this rule of correlative rights or reasonable use has been applied were cases in which percolating water was being extracted from land for the purpose of sale at a distance, for use in supplying water to cities and towns, or in irrigating other lands than those in which such water was found. This was held to be an unreasonable use of percolating water, which violated the rights of adjoining or adjacent landowners."

Some of the cases so announcing are Katz v. Walkinshaw, supra; Schenck v. Ann Arbor, 196 Mich. 75, 163 N. W. 109; Bernard v. St. Louis, 220 Mich. 159, 189 N. W. 891; Erickson v. Crookston Waterworks, Power & Light Co., 100 Minn. 481, 111 N. W. 391; Meeker v. East Orange, supra; Forbell v. New York, 164 N. Y. 522, 58 N. E. 644; Dinger v. New York, 86 N. Y. S. 577, 182 N. Y. 542, 75 N. E. 1129; Rouse v. Kinston, 188 N. C. 1, 123 S. E. 482, 35 A. L. R. 1203; Horne v. Utah Oil Ref. Co., 59 Utah, 279, 202 P. 815, 31 A. L. R. 883; Patrick v. Smith, 75 Wash. 407, 134 P. 1076.

It is worthy of note that many of the above cases involve municipalities. As said by us in Gulf, C. & S. F. Ry. Co. v. Richardson, 42 Okla. 457, 463, 141 P. 1107, 1110, where the trial court had ruled that a municipal corporation was exempt from the rules applicable to surface waters:

"The law makes no distinction in such cases between natural and artificial persons in the duty it imposes. The law holds the proprietor of the estate to the same obligation in the disposition of surface waters, whether he be a farmer, a municipality, or a railway corporation. The trial court overlooked this important fact in discharging the municipality of Wynnewood from liability."

The cases are in accord that a municipality has no greater right, in the absence of condemnation proceedings, to thus lay waste the farms of private individuals than has a water company or a private individual. Even if the rule were otherwise, it is probable that some showing of public necessity would be a condition precedent to absolving the municipality, and there was no such showing in this case. In fact, the evidence might lead to the opposite conclusion, for this "well farm," as it was called, was used only in an auxiliary manner, to augment the city's main water supply, and was closed down and not operated during most of the two or three years while this action was lying dormant and untried in the district court. The delay in bringing it to trial was at the instance of defendant, under a voluntary agreement made by defendant with plaintiffs, to the effect that a temporary restraining order then in force would remain in force unless and until the defendant should again commence pumping the wells. However, as stated above, the fact that defendant is a municipal corporation creates no distinction in its favor in this kind of case. The Gulf, C. & S. F. Ry. Co. Case, supra, is authority that the general rule prevails in this state. In commenting upon this phase of the question the Michigan court said, in Schenck v. City of Ann Arbor, 196 Mich. 75, 163 N. W. 109, L. R. A. 1917F, 691, Ann. Cas. 1918E, 267:

"There is no apparent reason for saying that because defendant is a municipal corporation, seeking water for the inhabitants of the city, it may therefore do what a private owner of the land may not do. The city is a private owner of this land, and the furnishing of water to its inhabitants is its private business. It is imperative that the people of the city have water; it is not imperative that they secure it at the expense of those owning lands adjoining lands owned by the city."

The defendant asserts that because of section 11785, O. S. 1931, the trial court could have entered no judgment except in its favor. We do not agree, and the remarks of the trial judge as set forth in the record do not indicate that the judgment was based upon that section. It reads:

"The owner of the land owns water standing thereon, or flowing over or under its surface, but not forming a definite stream. Water running in a definite stream, formed by nature over or under the surface, may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same."

If we avoid confusion by eliminating the parts of the section not material here, it reads in this manner:

"The owner of the land owns water flowing under its surface, but not forming a definite stream. Water running in a definite stream under the surface, may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue the same."

The first sentence in the section is the only part referring to subterranean percolating waters. Its substance is that the owner of the land owns the percolating water thereunder. It speaks of ownership only and is silent as to use. The next sentence, referring to underground streams, speaks of use only and is silent as to ownership. Since the second sentence, relating to streams, restricted the use thereof, and since no restriction of use as to percolating waters was expressed in the first sentence, was it thereby intended that there was to be no restriction upon the use of percolating water? Such may have been the intention, as far as the Legislature intended to legislate, but no further. We do not believe, however, that the landowner's ownership of percolating water was given him as a weapon with which to unreasonably maim his neighbor; nor do we believe it was intended that such ownership was to be uncircumscribed by the limitations usually imposed upon the use of property of other classes.

When we consider questions pertaining to the use of property and its injurious effect, our problems are not solved by merely determining ownership of the property so used. In all classes and forms of property the rights derived from ownership thereof, in so far as use by the owner is concerned, are subject to certain qualifications and conditions respecting the rights of others in the ownership and enjoyment of their own property and lives. It is not true that one may always use that which he owns in any manner he pleases, for his use becomes definitely restricted when it unreasonably conflicts with the same right existing in other persons and their right to a reasonable use of their property. One may own a vacant lot, or a building, or an automobile, but he does not by such ownership become vested with the legal right to injure his neighbor by an unreasonable use. Equity would not permit him to ruin his neighbor's property by maintaining a nuisance on his vacant lot, nor would the law countenance such a use of his automobile as would injure others, simply because he owned it. These things are

fundamental. We should therefore be slow indeed to place such a construction upon this statute as would give it the effect of associating arbitrary and unlimited power of use with mere ownership.

By whatever is meant when the statute says that the landowner "owns" that elusive and unstable substance, percolating water, beneath his land, it must likewise be true that the adjacent landowner is given the same with respect to that which underlies his land. If one owner invades the natural movement, placement, and percolation of such water by creating artificial suction with powerful motor driven pumps, it is not long until he is taking that water which was but a moment before "owned" by his neighboring landowner. We do not say that this is forbidden, so long as the taking is reasonable; but we do say that it exposes the futility of attempting to justify the complete exhaustion of a common supp'y of water on the ground that the landowner who has taken it all "owned" that part thereof underlying his land when the operations commenced. His neighbor likewise had an ownership.

If the theory of ownership of perco'ating water is that of ownership in place, it is self-evident that the defendant should be enjoined. If the theory is that of ownership by capture, such as is usually applied in exploration for oil, it still is not at all necessary that we blindly follow such theory to such extremes as will lead to gross injustice to innocent persons. We make no attempt to reconcile the result herein with the law of oil and gas, other than to point out that if oil had been sucked from beneath plaintiffs' property, their land as land, and their farms as farms, and their livestock, and their personal health and sanitation could not have thereby become impaired,—while the opposite must happen if they are deprived of water. And still less are we inclined to countenance such a result when the life-giving water, so extracted, is pulled from beneath the neighbor's land for sale at a distance.

The defendant asserts that plaintiffs should be estopped to seek relief. We cannot agree with this contention. The fact that plaintiffs accepted water in pipes from the defendant's wells, after their own water supply had been diminished or after the wells had already been put into operation, should not estop them, for the impression which we gain from the record is that plaintiffs had little choice in the matter; there was little else they could do. They had to have water. Furthermore, the water supply through the pipes was unsatisfactory and somewhat intermittent, and the defendant attempted to charge several of the plaintiffs for such service, and cut off the service to one or more of the plaintiffs upon their refusal to pay for it.

It is pointed out by defendant that plaintiffs stood by while defendant expended money and labor in the project, and made no attempt to halt the work. At that time the plaintiffs had no right to halt the work; they had not been damaged and had no means of knowing whether they would later be damaged; as stated by several of the witnesses, the water supply appeared to be "inexhaustible," though one of the plaintiffs did testify that he was fearful of the result. Silence does not create an estoppel unless there is a duty to speak. The result of the undertaking was not one which shou'd necessarily have been anticipated by the plaintiffs, and the defendant was as familiar with that subject, if not more so, than the plaintiffs. On the whole, there is no inference permissible from this record that the alleged silence of the plaintiffs influenced the defendant in any of its actions. For that matter, there was not complete silence of plaintiffs. It appears that when the plaintiffs attempted to consult with the city authorities they were told that no ill effects would come of the venture, and that if it should happen that their water supply should become impaired, the defendant would shut down its wells.

We cannot escape the conclusion that the rights of these citizens have been seriously infringed upon, and that it is the duty of this court to as zealously guard the rights of the individual as it is to facilitate the needs of the municipality. The inhabitants of the city must have water, but by our statutes and our Constitution the city is afforded a means of obtaining it without pauperizing those innocent private citizens who have devoted their lifetimes to improving, developing, and maintaining their homesteads.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with the views herein expressed.

McNEILL, C. J., and RILEY, BUSBY, and CORN, JJ., concur. OSBORN, V. C. J., and BAYLESS and GIBSON, JJ., dissent. WELCH, J., absent.

### On Rehearing.

PHELPS, J. On rehearing the question of propriety of remedy has been raised, and it has been suggested that if the same kind of action were instituted by owners of property surrounding the other sources of

defendant's water supply, it might result in depriving the inhabitants of the city of water. There is merit in this contention; however, it was pointed out above that the city has its statutory and constitutional means of obtaining the water. The city defended this action on the theory that no liability existed at all, and briefed it on the same theory, which theory, if affirmed, would necessitate total disregard of plaintiffs' injury. The city did not tender or attempt to tender the issue of eminent domain; its theory has been that it was under no duty or obligation whatsoever to the plaintiffs.

There is no doubt that the city of Shawnee might have commenced an action in condemnation to acquire the right, in the nature of an easement, to draw water from plaintiffs' land, if such is necessary for the public good. We have not held that this could not be done; and it is not yet too late to accomplish the same result. A public or municipal corporation having the right to invoke the power of eminent domain may tender such issue by answer and cross-petition. Collier v. Merced Irrigation District, 213 Cal. 554, 2 P. (2d) 790. For full discussion of that question, see that case, and City of New York v. Pine, 185 U. S. 93, 46 L. Ed. 820, and Newport v. Temescal Water Co., 149 Cal. 531, 87 P. 372, 375, 6 L. R. A. (N. S.) 1098. As stated in those cases, though the action be instituted in equity, the issue of eminent domain may be raised by the municipality by answer or cross-petition, in keeping with the fundamental principle of equity jurisdiction that once the hand of equity is invoked it will retain jurisdiction to determine the entire controversy and award full and final relief, thus bringing all possible litigation over the subject matter within the compass of one judicial determination. 1 Pomeroy, Equity (4th Ed.) sec. 242; 14 R. C. L. 322. Though invasions of water rights are generally held subject to injunction, where the defendant is a municipality, having the right to institute eminent domain proceedings, equity will usually afford the municipality the opportunity to tender that issue and will hold the extraordinary writ of injunction in abeyance· or grant what is sometimes referred to as an alternative injunction. Clark v. Nash, 198 U. S. 361, 49 L. Ed. 1085; 14 R. C. L. 323; Hart v. City of Seattle, 45 Wash. 300, 88 P. 205, 13 Ann. Cas. 438; cases cited at 32 C. J. 385, sec. 653. The elasticity of equity jurisdiction in the form of relief to be granted is recognized in our section 707, O. S.

1931, wherein injunction as a "provisional" remedy is authorized. In an annotation at 13 A. & E. Annotated Cases, 439, citing and discussing many cases wherein the remedy of unconditional injunction seemèd proper according to the general rules of law, yet where public inconvenience would necessarily have resulted from such a decree, it is pointed out that the remedy of conditional or alternative injunction is almost entirely restricted to situations wherein the right of eminent domain is involved, such as in the instant case.

The Collier Case, supra, involved substantially this same question. It was there said (quoting from another° decision) :

"And, finally, upon this proposition it may be said that, where the interests of the public are involved and the court can arrive in terms of money at the loss which plaintiff has sustained, an absolute injunction should not be granted, but an injunction conditional merely upon the failure of the defendant to make good the damage which results from its work."

In the petition for rehearing the rule of law laid down in the original opinion is not questioned, and in view of the statement therein that the city is. able to pay such damages as plaintiff may lawfully be entitled to, we adhere to our decision and direct that the trial court set a reasonable time within which the defendant may tender the issue of eminent domain and proceed to determine the damages in the manner provided by the statutes and Constitution for that purpose, failing in which, or in paying the damages awarded, let injunction issue.

BAYLESS, V. C. J., and BUSBY, CORN, GIBSON, and HURST, JJ., concur. OSBORN, C. J., and RILEY and WELCH, JJ., absent.