Jack SHARP, Jr., Bert Miles, Glen Harris, Jack Long, Jerry Hill and Allen Louvier, Appellees,

v.

251ST STREET LANDFILL, INC., an Oklahoma Corporation, Appellant.

No. 66105.

Supreme Court of Oklahoma.

April 23, 1991.

---

Richard R. Hutton, Edmond, Steven K. Balman, Tulsa, for appellees.

William W. Gorden, Jr., Oklahoma City, John William Barksdale, Okmulgee, for appellant.

LAVENDER, Justice.

We decide here: 1) whether the granting of a permit by the Oklahoma Department of Health (ODH) to Appellant, the 251st Street Landfill, Inc. to construct and operate a solid waste disposal facility was subject to review under the Oklahoma Administrative Procedures Act (OAPA), 75 O.S. 1981, § 301 et seq., as amended [now § 250 et seq.]; 2) whether the Oklahoma Solid Waste Management Act (OSWMA), 63 O.S. 1981, § 2251 et seq., as amended,[1] preempted a common law anticipatory nuisance action for injunctive relief; 3) whether granting a temporary injunction enjoining construction and operation was proper; 4) whether a substitution of party plaintiffs via an amended petition constituted error requiring reversal; 5) whether the trial court erred in setting the amount of the temporary injunction bond?

We hold the permit issuance was not subject to review under the OAPA and the OSWMA did not preempt a common law anticipatory nuisance action. Further, granting the temporary injunction was warranted. We also find no error in the handling of the substitution of party plaintiffs warranting reversal and the temporary injunction bond set was appropriate.

This matter was initiated by the Okmulgee County Toxic Waste Information Group, Inc. (the Group), a group of area residents and landowners, against Joan K. Leavitt (hereafter ODH), Commissioner of ODH and Appellant as a challenge to the granting of a solid waste landfill permit issued to Appellant by ODH under the OSWMA. The Group sought judicial review of the permit and alleged its members were adversely affected by its granting. ODH moved to dismiss, arguing granting of the permit was not subject to review under the OAPA and the proper course was to proceed directly against Appellant in an injunctive action. The trial court dismissed ODH and no appeal was taken therefrom.

After ODH's dismissal an amended petition was filed solely against Appellant, wherein certain individual area residents and landowners were named plaintiffs. Appellees' claim was primarily based on the probability of pollution to groundwater used for domestic and agricultural purposes they assert would likely be caused by operation of the landfill. The Group was not named in the amended petition, but the petition indicated Appellees were representing the interests of other landowners in the area. A hearing was held, after which a temporary injunction issued. Under 12 O.S.1981, § 1392, a bond of $25,000.00 was set to secure Appellant for any damages it might sustain if finally decided the injunction should not have been granted.

By a 2–1 vote the Court of Appeals reversed, essentially ruling the matter should have proceeded as an administrative appeal on the record from a final decision of an administrative agency under the OAPA. It found error in dismissal of ODH (even though the dismissal was never appealed and neither Appellant or Appellees directly raised the issue) and determined because the matter should have been limited to review under the OAPA, the trial court erred in accepting evidence outside the administrative record. Further, it determined

---

1. The Oklahoma Solid Waste Management Act was substantially amended in 1990 by the 42nd Oklahoma Legislature and its provisions were renumbered in the Oklahoma statutes as 63 O.S. Supp.1990, § 1–2300 et seq. Our decision in this case, unless otherwise indicated, is based on the statutes in effect at the time the permit was issued. *See Stewart v. Rood*, 796 P.2d 321, 323, f.n. 1 and 332–333 (Okla.1990). Accordingly, the decision does not express a position as to the effect of 63 O.S.Supp.1990, § 1–2415, which provides certain notice procedures and opportunity for hearing under the OAPA to persons in the county of a new proposed disposal site who may suffer environmental damage as a result of the construction and operation of the site.

the trial court erred by substituting its judgment for that of ODH. Finally, it decided because no administrative record was before the trial court no error could be found in ODH's decision to grant the permit under the review standards set out in 75 O.S.1981, § 322 of the OAPA. Appellees filed a petition for certiorari, which we previously granted.

## I. GRANTING OF THE PERMIT WAS NOT SUBJECT TO THE STRICTURES OF THE OKLAHOMA ADMINISTRATIVE PROCEDURES ACT.

■ In *Stewart v. Rood*, 796 P.2d 321 (Okla.1990), where a permit granted by ODH under the OSWMA was challenged, we, in part, determined judicial review under 75 O.S.1981, § 318 of the OAPA was available only when an opportunity for individual proceedings (i.e. trial-type proceedings as those envisioned by 75 O.S.1981, §§ 309–317 of the OAPA) are required prior to the granting of a permit. *Id.* at 328. We held the Legislature did not intend for individual proceedings to be conducted prior to the granting of such a permit and no constitutional source existed for the involved challengers (adjacent landowners to a proposed landfill) requiring such proceedings prior to issuance. *Id.* at 329–335. Our rationale there is dispositive of the view the trial court erred because he did not limit himself to reviewing the matter under the OAPA. No opportunity was statutorily or constitutionally required for an individual proceeding involving Appellees to be conducted by ODH prior to granting the permit. Granting of the permit was, thus, not subject to review under the OAPA.

## II. A LANDFILL PERMITTED BY ODH MAY BE ENJOINED

■ Appellant argues ODH's decision to permit the landfill and supervise it under the OSWMA is exclusive in the absence of some showing agency action was unconstitutional or void. Although not expressly, it asserts a common law anticipatory nuisance action was preempted by the OSWMA unless unconstitutional or void action was shown. It also argues, apparently alternatively, the agency decision to permit had to be shown to be either arbitrary or unreasonable for injunctive relief to issue. Finally, it posits even assuming injunctive relief would otherwise be appropriate these Appellees failed to prove entitlement to it under recognized equitable principles.[2] We reject Appellant's assertion the Legislature intended to preempt an anticipatory nuisance action. Although caution must be exercised where an administrative agency has given its approval to an activity of this sort injunctive relief is appropriate in certain circumstances.

## II(A). THE OSWMA DOES NOT PREEMPT AN INJUNCTIVE ACTION

■ 63 O.S.1981, § 2252 details the purposes of the OSWMA. They are to regulate the collection and disposal of solid wastes in a manner that will 1) *protect the public health, safety and welfare;* 2) *prevent water* and air *pollution;* 3) *prevent* the spread of disease and *the creation of nuisances;* 4) *conserve* valuable land and other *natural resources;* 5) *enhance the* beauty and *quality of the environment;* and 6) encourage recycling of solid waste.[3]

---

**2.** Appellant also took the position in its initial appellate brief that because construction and operation of the landfill had received the imprimatur of ODH the judicial review standards of the OAPA found at 75 O.S.1981, § 322, should be used to determine whether the granting of the extraordinary relief of a temporary injunction was appropriate. No authority was expressly cited for this position. We do not agree. As noted in the text, Part I, this action is not properly subject to judicial review under the OAPA. It proceeded on an anticipatory nuisance basis for injunctive relief and we see no need to engraft the judicial review standards of the OAPA on what is essentially a common law equitable proceeding, although as will be explained, the fact ODH permitted the site does impact our decision here.

**3.** Section 2252 was renumbered and amended in 1990. 63 O.S.Supp.1990, § 1–2301. The amendment specified transportation and processing of solid waste were part of the regulatory ambit, in addition to collection and disposal.

These purposes express legislative intent to prevent landfills from becoming nuisances and to prevent their operation from creating water pollution.[4] Nowhere in the OSWMA is an express legislative statement to preempt common law actions for equitable relief. To the contrary, certain provisions of the OSWMA and two other acts relating to the control of water pollution convince us no such preemption was intended.

The Legislature has given broad authority to ODH in the OSWMA to govern solid waste disposal and to control sanitary landfills. However, the OSWMA expressly provides for involvement of local governing bodies and the courts in the decision-making process. 63 O.S.1981, § 2260 [now 63 O.S.Supp.1990, § 1–2418], after spelling out the powers and duties of ODH (including the power to issue permits), contains the following provision:

> Notwithstanding the foregoing provisions of this section, any local governing body may by ordinance or resolution adopt *standards for the location, design, construction, and maintenance of solid wastes disposal sites and facilities more restrictive than those adopted by [ODH] under the provisions of this act.* (emphasis added)

The provision, in plain terms, expresses an intent to allow such bodies the ability to adopt *stricter* standards than ODH as to location, design, construction and maintenance. Although no standards of a local governing body are involved here and the provision does not indicate intent to preserve traditional common law remedies, it expresses a view the standards of ODH are *minimum* standards and the Legislature did not envision ODH as having *exclusive* control of waste management activities in Oklahoma.

Another provision indicating the non-exclusivity of ODH control is a provision establishing a court action for loss of value damages *and injunction* for owners of land with occupied residences within a certain distance of the proposed landfill. 63 O.S.Supp.1985, § 2258 [now 63 O.S.Supp. 1990, § 1–2414(B)]. In the injunction action the court is given authority by the Legislature to balance the negative impact to the residences in the specified area with the public benefit of the proposed disposal site and *enjoin operation* if the negative impact outweighs the public benefit, *even after ODH has granted a permit.* Although the instant proceeding was not brought under § 2258, nor does the evidence show any Appellees are within the specified distances (formerly 500 yards; now one/half mile), the section signifies an intent ODH has a *shared responsibility* in controlling landfills.

Furthermore, two statutory schemes in the area of prevention of water pollution plainly exhibit legislative intent *to preserve common law remedies.* These are an act concerning pollution remedies [82 O.S.1981, §§ 926.1–926.13, as amended] and the Pollution Control Coordinating Act of 1968, 82 O.S.1981, § 931 et seq., as amended. Both acts include as part of their purposes the prevention, abatement and control of underground water pollution. 82 O.S.1981, §§ 926.1(6), 926.2, 932.1(a) and (e), and 937.-1. Although detailed remedies are provided in both acts for water pollution and certain duties, responsibilities and enforce-

---

**4.** No argument is made here by Appellant that a landfill is a legalized nuisance done or maintained under the express authority of a statute or that approval by ODH alone is sufficient to transform it into one. Although we have ruled an activity done or maintained under the express authority of a statute may not be enjoined because it would then be a legalized nuisance and that approval by an administrative agency may impact such a finding in certain limited circumstances [*E.I. Du Pont De Nemours Powder Co. v. Dodson,* 49 Okla. 58, 150 P. 1085 (1915)], we have never ruled approval of an activity by an administrative agency *alone* is sufficient to transform what would otherwise be considered a nuisance, abatable or subject to injunction, into a legalized nuisance impervious to such forms of relief. Although involving a case requesting damages we ruled in *Oklahoma City v. West,* 155 Okla. 63, 7 P.2d 888, Third Syllabus (1931), that where work is required or authorized by the Legislature and a nuisance is not the necessary result of performance it may not be contended a nuisance is legalized. Sanitary landfills *do not* necessarily result in the creation of nuisances. To so argue would render meaningless portions of the stated purposes of the Legislature in § 2252 of the OSWMA.

ment mechanisms are provided therein for state agencies, *both expressly provide such remedies are additional and cumulative to already existing common law rights of private individuals.* Section 926.13 provides:

It is the purpose of this act to provide additional and cumulative remedies to prevent, abate and control the pollution of the waters of the state. Nothing herein contained shall be construed to abridge or alter rights of action or remedies under the common law or statutory law, criminal or civil; nor shall any provision of this act, or any act done by virtue thereof, be construed as estopping the state, or any municipality or person, as riparian owners or otherwise, in the exercise of their rights under the common law to suppress nuisances or to abate pollution.

The Pollution Control Coordinating Act of 1968 at § 937.1(a) states:

It is the purpose of this act to provide additional and cumulative remedies to prevent, abate and control the pollution of the environment of the state. Nothing contained herein shall be construed to abridge or alter rights of action or remedies in equity under the common law or statutory law, criminal or civil, nor shall any provisions of this act, or any act done by virtue thereof, be construed as estopping the state or any municipality or person affected by pollution, in the exercise of their rights in equity or under the common law or statutory law, to suppress nuisances or to abate pollution.

It would be difficult to envision much clearer expressions of legislative intent *to preserve* common law equitable remedies in the area of preventing or abating water pollution.[5]

Our case law also supports the view an activity of this sort may be enjoined even though approved by ODH. Although upholding denial of injunctive relief against construction and operation of sanitary sewage treatment facilities in *O'Laughlin v. City of Fort Gibson,* 389 P.2d 506 (Okla. 1964), we implicitly recognized such facilities could be enjoined even though approved by ODH. There, ODH had apparently issued a permit to the City of Fort Gibson for the proposed facilities under 63 O.S.1961, § 614 et seq. [since repealed; now *See* 63 O.S.1981, § 1–901 et seq., as amended]. *O'Laughlin, supra,* at 508. Injunctive relief was inappropriate, however, because plaintiffs failed to show a reasonable probability they would be injured by operation. *Id.* at 509–510. In part, the accepted common law standard in Oklahoma for enjoining a prospective or contemplated nuisance is a showing of a reasonable probability the activity will injure the plaintiff. *Id; Mcpherson v. First Presbyterian Church,* 120 Okla. 40, 248 P. 561, 566 (1926); *See also Town of Rush Springs v. Bentley,* 75 Okla. 119, 182 P. 664, 665 (1919) (permanent injunction against construction and operation of town sewer basin and septic tank upheld on basis nuisance would be created by obnoxious odors). We, therefore, hold ODH does not have exclusive jurisdiction under the OSW-MA to control sanitary landfills and an anticipatory nuisance action is not preempted by that Act.

II(B). WHEN LEGISLATIVE PURPOSE IS THWARTED AND A SHOWING IS MADE OF ENTITLEMENT TO RELIEF UNDER TRADITIONAL EQUITABLE PRINCIPLES AN INJUNCTION IS APPROPRIATE

Generally, the rules, regulations and decisions of administrative agencies are presumed valid. *See Toxic Waste Impact Group, Inc. v. Leavitt,* 755 P.2d 626, 630 (Okla.1988); *Banking Board of the State of Oklahoma v. Wilkerson,* 642 P.2d 1141, 1142 (Okla.1982). However, when such rules or decisions are inconsistent with legislative intent a court is not bound by them [*See Webb v. Hodel,* 878 F.2d 1252, 1255

---

**5.** It should be noted this case involves a situation where the administrative process as to granting the permit *was at an end.* We do not have before us a situation where that process *was still ongoing* and we need not decide here whether injunctive relief would be appropriate if the permitting process was ongoing.

(10th Cir.1989) ], but instead is duty bound to effectuate the expressed legislative purpose. *See State v. Warren*, 331 P.2d 405, 408 (Okla.1958).

Although we have been extremely cautious in our pronouncements concerning equitable relief when the decisions of administrative agencies are involved, we have recognized the principle in similar circumstances that *even the acts of public boards themselves may be enjoined if they are found to have acted illegally and a plaintiff can show execution of such acts would cause irreparable injury to his rights or privileges that are cognizable in equity. Stephens v. Borgman*, 202 Okla. 41, 210 P.2d 176, Second Syllabus (1949). Injunctions are also appropriate against the discretionary actions of public boards themselves where irreparable injury is shown in cases involving gross abuse of discretion if it appears the agency action is undertaken for untenable reasons or to an unreasonable extent. *Shadid v. Oklahoma Alcoholic Beverage Control Board*, 639 P.2d 1239, 1242 (Okla.1982).

 Although the decision of ODH to grant a permit may come to us with a presumption it represents a faithful carrying out of its responsibility under the OSW-MA, if it is adequately shown that decision does not effectuate legislative purpose to prevent a nuisance or water pollution an injunction may be appropriate. This may be done by showing safety features approved by ODH were not sufficient to prevent these results at the particular location (but other safety precautions would be sufficient) *or* because of the location and other circumstances no feasible safety precautions would be sufficient at the particular location.[6] If such were shown we believe a court would be warranted in concluding

ODH acted unreasonably and contrary to legislative purpose.

 An injunction may also be appropriate after the landfill had received the imprimatur of ODH and the design, construction and operation methods approved via the permit *were sufficient* to prevent the creation of a nuisance or water pollution, but it was shown because of some improper construction or operation by Appellant *in violation of agency requirements*, creation of a nuisance or pollution would result. *See Weaver v. Bishop*, 174 Okla. 492, 52 P.2d 853, 861–867 (1935) (business properly permitted under valid municipal zoning ordinance may not be enjoined absent showing it would be improperly erected or conducted); *Town of Jennings v. Pappenfuss*, 129 Okla. 85, 263 P. 456, 457 (1928) (particular method of town's maintenance or operation of sewer system may be enjoined even though sewer system was established under express authority of statute). In such a situation, although ODH has properly carried out its responsibility, legislative goals would instead be thwarted by improper methods of construction or operation contrary to ODH requirements.

In our view, whether a showing is made of failure on the part of ODH or the landfill operator, or both of them, to properly effectuate the legislative purposes expressed in § 2252, landowners in Appellees' position still would have the burden to show entitlement to relief under traditional equitable principles.

### III. STANDARDS FOR SHOWING ENTITLEMENT TO EQUITABLE RELIEF.

In pursuing a temporary injunction Appellees proceeded under 12 O.S.1981, § 1382. A temporary injunction is to pre-

---

**6.** No one argues here sanitary landfills are nuisances *per se*. A nuisance *per se* is an act, occupation or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings. *McPherson v. First Presbyterian Church*, 120 Okla. 40, 248 P. 561, 564 (1926). If a nuisance, it would be one *per accidens* or in fact, which has been defined as an act, occupation or structure, not a nuisance *per se*, but which may become a nuisance by virtue of the circumstances, location or sur-

roundings. *Id.* 248 P. at 564–565. *See Horn v. Community Refuse Disposal, Inc.*, 186 Neb. 43, 180 N.W.2d 691, 693 (1970) (generally accepted that sanitary landfills are not nuisances *per se*, but may become a nuisance in fact by manner of its operation); *Wood v. Town of Wilton*, 156 Conn. 304, 240 A.2d 904, 907 (1968) (refuse disposal operation is not nuisance *per se*); *Myers v. City of Hagerstown*, 214 Md. 312, 135 A.2d 147, 148 (1957) (garbage dump is generally held not to be nuisance *per se*).

serve the status quo and prevent the perpetuation of a wrong or the doing of an act whereby the rights of the moving party may be materially invaded, injured or endangered. *Glasco v. School District No. 22*, 24 Okla. 236, 103 P. 687 (1909). It protects a court's ability to render a meaningful decision on the merits of the controversy. *Anthony v. Texaco, Inc.*, 803 F.2d 593, 597 (10th Cir.1986); *See Truttman v. City of McAlester*, 206 Okla. 297, 243 P.2d 352, 354 (1952).

Generally, to be entitled to a temporary injunction the moving party must show a reasonable probability of final success on the merits and that if the injunction is not granted a reasonable probability he will suffer irreparable harm because of the anticipated acts of the defendant. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980), citing *Crowther v. Seaborg*, 415 F.2d 437 (10th Cir.1969). A court should also balance the equities of the parties and determine whether the threatened injury to movant outweighs whatever damage the proposed injunction may cause the opposing party and, finally, determine, if the injunction issues, it would not be adverse to the public interest. *Lundgrin, supra*, 619 F.2d at 63.

Mere fear or apprehension of injury is not sufficient for granting a temporary injunction. *Burnett v. Sapulpa Refining Co.*, 59 Okla. 276, 159 P. 360, 361 (1916). Appellees had to show pollution of their underground water sources would most probably result to their irreparable injury from the operation of the landfill. *See Clinton Cemetery Association v. McAttee*, 27 Okla. 160, 111 P. 392 (1910). For injunctive relief generally the right must be established by clear and convincing evidence. *Jackson v. Williams*, 714 P.2d 1017, 1020 (Okla.1985); *Thomas v. Hampton*, 583 P.2d 506, 507–508 (Okla.1978). *McPherson v. First Presbyterian Church, supra*, 248 P. at 566, makes clear that to enjoin a threatened nuisance it must appear injury would be irreparable in damages and evidence must be clear and convincing, not of a possibility or apprehension, but of a reasonable probability.

Although injunctions should not be lightly granted, an application for a temporary injunction is addressed to the trial court's discretion and its ruling will not be disturbed on appeal absent a clear showing of error, either legal or factual, or an abuse of discretion. *See Amoco Production Co. v. Lindley*, 609 P.2d 733, 745 (Okla.1980); *Barnsdall Oil Co. v. Jackson*, 180 Okl. 589, 71 P.2d 719, 719–720 (1937); *See also City of Moore v. Central Oklahoma Conservancy District*, 441 P.2d 452, 459 (Okla. 1968) (recognizing in cases of equitable cognizance if the ultimate conclusion of the trial court is correct it will be affirmed and only when the decision is clearly against the weight of the evidence or contrary to law or established principles of equity will it be disturbed). On appeal we are bound neither by the reasoning of the trial court nor by its findings, but we may examine, consider and weigh all the evidence. *Jackson v. Williams, supra*, 714 P.2d at 1020. It is under these standards we review the decision of the trial court and our review of the record convinces us a temporary injunction was warranted.

## III(A). EVIDENCE RELATING TO TEMPORARY INJUNCTION.

The landfill site is the West ½ of Section 10, Township 15North, Range 12East, Okmulgee County, Oklahoma.[7] Out of the 320 acres of the site about 90 acres will be used as cells for the disposal of refuse. Under the applicable ODH rules adopted August 8, 1985 [Regulations Governing Solid Waste and Sludge Management, Oklahoma State Department of Health Bulletin 0524, 2 Okla.Reg. 02673–02735 (1985) ] the landfill was permitted as a Type I–B facility. Such a facility is generally defined at ODH Rule 1.2.2(b) as a metropolitan sanitary landfill serving a population of 30,000 or more persons which does not accept hazardous waste. The

---

7. A section of land is a square mile and consists of 640 acres. BLACK'S LAW DICTIONARY 1521 (4th ed. 1968).

landfill will primarily serve Tulsa and Okmulgee Counties. The major portion of the waste to be deposited will be domestic waste.

The cells of the site where waste will be deposited will be lined with a three foot thick clay liner. Pursuant to ODH Rule 2.1.3.1.2 this is one alternative requirement for a Type I–B landfill to provide protection for groundwater in the area. The alternative requirement is the same liner, but with an admixture of sodium bentonite or other ODH approved additive.[8] Although ODH rules say such a clay liner provides the highest protection for groundwater [See ODH Rules 2.1.2.1 and 2.1.3.1.2] in regard to a Type I–B landfill, the rules expressly indicate groundwater protection standards delineated by ODH are *minimum* standards and they may be exceeded by an applicant. Rule 2.1.3. Further, ODH Rule 2.1.3.1.2 indicates that in areas of the State with high rainfall it is recommended a leachate collection and treatment system be installed.[9] Apparently, no such system was planned for the instant landfill.

A half mile east of the site is U.S. Highway 75. Directly north of the site is 251st Street, a road which will provide access to it. All Appellees apparently live or own land in the general area of the proposed landfill. Four Appellees testified. They own land north and east of the site, none of which is in the same section as the site. The closest is about three quarters to a mile away. Of the four that testified the evidence indicates they either have or plan to drill artesian well(s) on their land.[10] The wells are used for domestic purposes, livestock and agricultural crops. Two Appellees indicated they are served by rural or city water in addition to their wells and one of these individuals appeared to testify at least one of the wells on his land was a shallow well and not artesian. The third named Appellee indicated he had no other source of water. The last, who planned to build on his property, was informed it would cost about $10,000 to bring in a rural water district line, after the water district had layed a line within one/half mile of his property. He had also been informed it would cost $3,000 to drill a well.

Beginning east of U.S. Highway 75 is the town of Winchester. Testimony indicated 60 families lived there and each had wells. Evidence also indicated 10–12 more families were building in the area and each site had a well. The town of Winchester is not served by a rural water district and a land developer indicated it would be very difficult to bring in rural water and without well water further development of the area would be in bad trouble.[11] Although Win-

**8.** Sodium bentonite is a colloidal clay, which has a high swelling capacity in water. THE CONDENSED CHEMICAL DICTIONARY 99 (8th ed. 1971). The use of such an additive would apparently provide additional protection for groundwater under a landfill site. It has been used as a bonding agent and sealant. *Id.*

**9.** Evidence indicated leachate is a contaminate that usually comes from solid waste sites as *surface water infiltrates into compacted refuse.* It is defined as a quantity of liquid that has percolated through a solid and leached out some of the constituents. THE OXFORD ENGLISH DICTIONARY Vol. VIII 741 (2nd ed. 1989). Leachate may contain various pollutants depending on the makeup of the refuse disposed of at a site.

**10.** An artesian well is made by boring into the earth until water is reached which from internal pressure flows up like a fountain. WEBSTER'S NEW COLLEGIATE DICTIONARY 63 (1979). Testimony indicated it is a well drilled into the earth's strata until a confined acquifer is encountered and the water confined therein rises above the confining layer. A confined acquifer consists of a permeable zone of the earth's strata containing water which is bounded above and below by strata of low permeability. Whittemore, *The Mechanics of Groundwater Pollution,* 35 Kan.L.Rev. 345, 350 (1987).

**11.** Appellees have never expressly specified whether their case is grounded on a public or private nuisance. A public nuisance is statutorily defined as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." 50 O.S. 1981, § 2. Appellees' case, as presented by them, has aspects of both a public and private nuisance. This is so because of the considerable amount of testimony in the record concerning the town of Winchester and the terminology used in their amended petition which indicated they were representing other landowners in the area. We need not definitively decide here whether their case was meant to be exclusively either a private or public nuisance because we

chester begins about one/half mile east of the site, the surrounding area appears mainly rural and population density relatively low. A map of the area showed Winchester covers three entire sections east and southeast of the site and parts of two others, one to the southeast and the other northeast.

To support their case concerning the probability of water pollution Appellees principally relied on an expert in the field of hydrogeology.[12] He testified the depths of the wells (or most of them), where depths were specified, coincided with the depths of certain sandstone confined acquifers under the proposed landfill. Further, Eagle Creek, a creek running through the landfill site, runs through some, if not all, of the land of Appellees. The creek generally flows in a direction from the site toward the land of Appellees. The water table or unconfined acquifer[13] under the landfill in part flows north and east, which is toward Appellees.

Although Appellees' expert was not absolutely certain operation of the landfill would pollute the wells of Appellees we believe his testimony supported the view of a reasonable probability, notwithstanding approval by ODH. He gave an opinion it was most likely the wells were tapping into the confined acquifer(s) under the landfill site. He further testified there was a high likelihood of pollution into the water table acquifer and a very strong possibility of communication between the water table acquifer and the confined acquifer(s). In such regard he testified Appellant had inadequate data to conclude there was no communication between the two acquifer systems.[14] He also indicated his view there was generally a high probability of polluting the groundwater in the area. He further testified once groundwater is polluted it is very difficult to get it back out, i.e. to restore the groundwater to usable quality.[15]

Appellees' expert further opined the design submitted to ODH for closure of the site after the disposal cells had been filled created a risk the refuse filled cells would erode and garbage mixed with water would flow into Eagle Creek toward the land of Appellees. He also gave an opinion normal domestic garbage contains a certain amount of toxic or hazardous waste and such wastes would find their way into the landfill because no one adequately monitors household garbage to determine the toxic or hazardous products contained therein. Further, Appellees' expert gave an opinion that although a clay liner is the ODH requirement, leachate will pass through it given a sufficient amount of time. Such testimony was basically consistent with testimony of experts called by Appellant who admitted, although the clay liner to be installed was state of the art, such liners do not completely stop leachate

have recognized a nuisance may at the same time be both public and private. *See Jordan v. Luippold,* 189 Okla. 189, 114 P.2d 917, 918–919 (1941). We have also recognized that pollution of a water well may constitute a private nuisance. *Gulf Oil Corporation v. Hughes,* 371 P.2d 81 (Okla.1962). Furthermore, when a private individual can show a public nuisance is specially injurious to him he may maintain an action to abate it. *Thomas v. Farrier,* 179 Okla. 263, 65 P.2d 526, First Syllabus (1937); 50 O.S. 1981, § 10.

12. Hydrogeology is a part of geology that studies the relations of water on or below the surface of the earth. THE OXFORD ENGLISH DICTIONARY Vol. VII 537 (2d ed. 1989).

13. An unconfined acquifer, although saturated with water, is unlike a confined acquifer. It is not bounded above and below by relatively impermeable layers and, consequently, the water confined therein is not in a pressurized state. Water from a well drilled into such an acquifer will not rise above the acquifer. An unconfined acquifer is what is commonly referred to as the water table. *See* Whittemore, *The Mechanics of Groundwater Pollution, supra* note 10.

14. One avenue for a deep acquifer to become contaminated is through leakage from other acquifers. U.S. EPA, 1 OVERVIEW OF STATE GROUND–WATER SUMMARIES 5 (March 1985).

15. The difficulty, complexity and costliness of remedying groundwater contamination is well documented. Ng, *A DRASTIC Approach to Controlling Groundwater Pollution,* 98 Yale L.J. 773, 778 (1989); U.S. EPA, GROUND–WATER PROTECTION STRATEGY 11 (August 1984). Furthermore, once seriously contaminated groundwater is often rendered unusable and cleaning it up is often unsuccessful. *Id.* at 18.

from passing through, but merely impede it or slow it down. In essence then, Appellees' expert was of the view the safety provisions of ODH for the instant landfill at the particular location were insufficient to protect the groundwater and there was a probable threat Appellees' wells would be polluted over time.

Further, although the parties did not present evidence concerning the need for a leachate collection and treatment system or what effect that would have in preventing the potential pollution of the groundwater in the area, the site of the landfill appears to be in an area of the State with relatively high rainfall.[16]

Appellant countered with experts of its own. One of them was also in the field of hydrogeology, who had assisted in preparing the application of Appellant. He had similar qualifications to Appellees' expert. He testified he had conducted a detailed study of the hydrogeology of the area and had concluded to a reasonable certainty the confined acquifer(s) under the landfill site were not the same as the ones feeding the artesian wells of Appellees. His opinion was the flow of the confined acquifers under the site was to the northwest, away from Appellees, and said acquifers were "recharged" (i.e. replenished)[17] from areas east or southeast of the site in the form of rock outcroppings exposed to the surface some distance from the landfill site. He did testify, however, the water table acquifer, in part, flowed in the direction of Appellees' land.

Another expert for Appellant was in the area of geotechnical engineering. He testified the clay liner would be "state of the art" and would be constructed to ODH requirements, including its permeability requirement. He, however, admitted such liners do not completely stop leachate, but they merely impede its flow and that it was well documented in the literature there have been failures in clay liners. He also gave an opinion that under the proposed design features of ODH, which would be followed, it would take in the "neighborhood" of two to three decades for any leachate to pass through the liner because the cells would be constructed to minimize the amount of water in the disposal cells. He did, however, appear to testify if water in the cells was not minimized leachate would pass through the liner quicker.

Appellant presented little, if any, evidence to counter Appellees' presentation toxic or hazardous products would find their way into the disposal cells. Furthermore, other than a general reference to some unspecified remediation possibility should groundwater contamination occur, Appellant did not refute the testimony of Appellees' expert that once pollution was transmitted into one or more of the acquifers it would be very difficult to get it back out.

Although other testimony was presented by Appellees concerning deficiencies in the application or proposed construction methodology, the above evidence, we believe, was sufficient to warrant the temporary injunction. It showed a reasonable probability of pollution of the wells and tended to show the clay liner at the particular location would not be adequate to protect the groundwater in the area.

The trial court was not required to credit the testimony of Appellant's expert over the expert for Appellees. Even though the former had done a more detailed study of the hydrogeology of the area it is clear that in the area of hydrogeology initial reports of no danger from contamination or the flow direction of an acquifer have been incorrect. *See Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1193 f.n. 2 (6th

---

16. For various climatological data Oklahoma is broken up into nine divisions. STATISTICAL ABSTRACT OF OKLAHOMA 9 (1990). Okmulgee County, the site of the proposed landfill is in the East Central Division. *Id.* From 1977 through 1988 the East Central Division had the second highest average precipitation of the nine divisions. *Id.* at 10 and STATISTICAL ABSTRACT OF OKLAHOMA 40 (1984).

17. Recharge areas are generally areas of higher elevation of the same rock formations as a confined acquifer where the formation is under unconfined conditions. *See* Whittemore, *The Mechanics of Groundwater Pollution,* 35 Kan.L. Rev. at 350, *supra* note 10.

Cir.1988) (even after contamination by hazardous landfill had been detected United States Geological Survey issued a report concluding no danger to domestic wells because it concluded the acquifer moved in a direction away from a residential development; in actuality it, in part, moved toward the development). We, thus, believe Appellees adequately showed they would be entitled to some form of injunctive relief on the merits and the decision of ODH to grant the permit did not comport with the legislative purposes to prevent nuisances or groundwater pollution.

The evidence also supported a determination of the probability of irreparable injury. Injury or detriment is irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative it would be difficult if not impossible to correctly arrive at the correct amount of damages. *Hines v. Independent School Dist. No. 50, Grant County,* 380 P.2d 943, 946 (Okla.1963). In the first instance, we have recognized generally invasions of water rights are subject to injunction. *See Canada v. City of Shawnee,* 179 Okla. 53, 64 P.2d 694, 700 (1936); *Baker v. Ellis,* 292 P.2d 1037, 1039 (Okla.1956); *See also Gilmore v. Royal Salt Co.,* 115 P. 541 (Kan.1911). Furthermore, pollution of a groundwater source is a type of environmental damage relatively unsusceptible to remediation. *See* note 15, *supra; See also Amoco Production Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (environmental damage can seldom be remedied by money damages and is often permanent or at least of long duration). The evidence also does not support a conclusion Appellant is in a financial position to pay for loss of Appellees' water source. *Compare Powell Briscoe, Inc. v. Peters,* 269 P.2d 787, 791 (Okla.1954) (where contemplated injury can be fully compensated in money damages and defendant is unquestionably solvent temporary injunction should not be granted). Further, although the record showed some Appellees have access to other sources of water, it does not show these sources would be adequate to supply all their needs or the potential cost over an extended period of time of these other sources should their wells become unusable.

We also believe the balance of equities here favors Appellees due to the potential long-term effects contamination may have to their water sources and granting the injunction was not adverse to the public interest. At most, Appellant has a financial stake in constructing and operating its landfill. Although this Court recognizes the need for landfills, this record does not conclusively indicate a particular need for the involved one at the designated location. This factor, coupled with the legislative purpose to prevent the creation of nuisances and water pollution, convinces us granting the injunction was not adverse to the public interest. It is, thus, our view the trial court was warranted in granting a temporary injunction against construction and operation of the landfill.[18]

Our decision here should not be taken to prejudge the propriety of a permanent injunction. At the hearing on such an injunction both sides will have the opportunity to present additional evidence to support their respective positions. Further, we note an injunction should generally be limited to the nuisance creating characteristic(s) of a

---

**18.** Although we believe the trial court was warranted in granting the temporary injunction we are not prepared to endorse his sweeping condemnation generally of landfills over major acquifers, those near major highways or in areas where there may be future residential development. In the first instance, other than the potential for polluting wells in the area there is *no* evidence in this record placement of the landfill will have an effect one way or the other on future residential development. Furthermore, the record is clear the area of the proposed site is generally rural in nature and of relatively low population density. We also see no indication in this record the proximity of the site to either U.S. Highway 75 or any other road would have a nuisance creating effect. His view as to siting over major acquifers, although having relevance in this proceeding, is not alone sufficient for the granting of injunctive relief in favor of these Appellees. Although an appropriate public entity may have the authority to obtain an injunction for potential pollution of groundwater generally these Appellees have no such right under general equitable principles because they are required to show a reasonable probability of irreparable injury *to themselves.*

business and it is only where a business cannot be conducted in any manner at a specific location without constituting substantial injury to other property owners that an injunction should absolutely prohibit operation. *Fidelity Laboratories, Inc. v. Oklahoma City*, 190 Okla. 488, 125 P.2d 757, 759 (1942). It will, thus, be necessary for the trial court to determine if other measures (such as a leachate collection and treatment system) would provide adequate protection against the probability of pollution when this case returns to the trial court on the propriety of a permanent injunction.

## IV. THE TRIAL COURT DID NOT ERR IN SETTING THE AMOUNT OF THE TEMPORARY INJUNCTION BOND.

■ After the trial court granted the temporary injunction, he required Appellees, in accordance with 12 O.S.1981, § 1392, to post a bond securing Appellant for damages it might sustain should it be determined the injunction was wrongfully granted. The trial court set the amount at $25,000.00 to cover a time period from the granting of the injunction to the anticipated date of the hearing on the permanent injunction. The trial court did not include an amount for anticipated lost profits claimed by Appellant. We can find no error in the amount of the bond.

A case providing guidance on lost profit damages attributable to a temporary injunction is *Oklahoma Cotton Growers' Ass'n v. Groff*, 135 Okla. 285, 275 P. 1032 (1929). There, the question was how to measure damages sustained when plaintiff sold cotton for a lower market price after the injunction was lifted than that prevailing when the temporary injunction was issued. In holding for defendant, we set out three elements which must be proved in order to recover lost profits. *Id.* 275 P. at 1033. The enjoined party must show (1) a bona fide offer, (2) he was in a position to accept, and (3) but for the injunction he would have accepted. *Id.* Such damages

cannot be established by guesswork, conjecture, uncertain estimates or mere conclusions, but by tangible facts. *Prager's Paris Fashion v. Seidenbach*, 113 Okla. 271, 242 P. 260, 262–263 (1925). Appellant failed to meet this standard with regard to anticipated profits.

On an exhibit admitted at the bond hearing Appellant listed eight private haulers as one source of lost profits. Certain testimony appears to initially show four of the eight were ready to contract for its services. However, Appellant *did not* identify which four private haulers supposedly extended offers to contract.

Appellant, through one of its principals, also presented testimony eighty percent of the private haulers "indicated" that hauling to Appellant's proposed landfill would be no problem, assuming it was closer than other landfills. This would seem to show six, rather than four, of the private haulers might have been ready to use the landfill. Thus, Appellant's evidence regarding the private haulers is both confusing and contradictory.

We also believe the evidence taken as a whole does not satisfy the first element required by *Oklahoma Cotton Growers' Ass'n, supra*, i.e. a bona fide offer. An offer is the expression of a person's willingness to become a party to an agreement and entails a willingness which could be considered a definite commitment.[19] An "indication" by eighty percent of the private haulers is not a definite commitment, and thus, not a bona fide offer. Likewise, the burden of proof is not met regarding the four private haulers which were supposedly ready to contract. It is impossible to determine from the evidence presented who the four haulers were, or the percentage of lost profits attributable to them. The certainty required in proving a bona fide offer necessarily entails offering facts from which a determination of actual damages can be made.

Appellant also lists commercial haulers and construction debris as sources of lost

profits. As we view the record the evidence in regard to these entities was also not sufficient to support the certainty necessary in regard to losses for anticipated profits. In short, Appellant offered nothing from which one could determine a definite amount of anticipated lost profits attributable to the temporary injunction and Appellant failed to meet its burden of proving lost profit damages with reasonable certainty. Consequently, it was not necessary for the trial court to consider any anticipated profits when it set the bond amount. When one discards lost profits, as the trial court correctly did, we cannot find error in the amount set.

### V. NO REVERSIBLE ERROR OCCURRED BY A SUBSTITUTION OF PARTY PLAINTIFFS.

After ODH was dismissed from the case by the trial court the initial petition filed by the Group was amended so that six named individuals were the only listed plaintiffs. At the start of the hearing on the temporary injunction Appellant moved to dismiss the amended petition for the reason the Group had been completely eliminated as a plaintiff. The trial court denied the motion. Although Appellant did not cite any rule in support of dismissal in the trial court, its petition in error indicates the trial court erred in failing to dismiss the amended petition because it was filed by *improper* party plaintiffs. In its appellate brief Appellant now essentially asserts the Group, and apparently all its members, are indispensable parties to the instant litigation under 12 O.S.Supp.1984, § 2019 and the trial court should have determined the question of the Group's status prior to proceeding to hear the temporary injunction application. We do not believe Appellant's arguments require reversal at this stage of the litigation.

It is quite clear the named Appellees are real parties in interest in regard to the instant lawsuit under 12 O.S.Supp.1984, § 2017(A). These Appellees were not and are not improper party plaintiffs. Further, although other individuals or entities may also be proper parties to join in the proceeding, Appellant *never* made any intelligible motion to join such parties below or to dismiss the action for failure to join any indispensable parties, options that were available to it prior to the hearing and would still be available when this case is returned to the trial court. 12 O.S.Supp. 1984, §§ 2012(B)(7), 2012(F)(2) and 2021. Thus, we do not believe reversible error occurred by any improper substitution of party plaintiffs. When the case returns to the trial court a determination under 12 O.S.Supp.1984, § 2019 concerning indispensable parties may still be made.

Finding no error in the trial court's decision to grant a temporary injunction or in regard to the other matters raised by Appellant warranting reversal we AFFIRM the decision of the trial court and VACATE the decision of the Court of Appeals.

SIMMS, DOOLIN, HARGRAVE and SUMMERS, JJ., concur.

OPALA, C.J., HODGES, V.C.J., and ALMA WILSON and KAUGER, JJ., concur in part, dissent in part.