Dear Senator Brown,
¶ 0 This office has received your request for an official Attorney General's Opinion, in which you ask, in effect, the following question:
 Does the due process clause of either the United States Constitution or Oklahoma Constitution require that the Oklahoma State Board of Agriculture afford a hearing (in the form of an individual proceeding under the Oklahoma Administrative Procedures Act, 75 O.S. 1991 and Supp. 1995, §§ 250-323) to those who own land either adjacent to or in close proximity of a proposed feed yard, prior to the issuance of a feed yard license under the provisions of the Oklahoma Feed Yards Act, 2 O.S. 1991 and Supp. 1995, §§ 9-201 through 9-212?
 I. GENERAL NATURE OF THE OKLAHOMA FEED YARDS ACT
Feed Yards
¶ 1 We begin our analysis of your question by reviewing the provisions of the Oklahoma Feed Yards Act, 2 O.S. 1991 and Supp.1995, §§ 9-201 through 9-212. Under that Act, "concentrated animal feeding operations," also called "feed yards," are defined to include animal feeding operations at which:
 a. More than the number of animals specified in any of the following categories are confined:
. . . .
 (3) 2,500 swine each weighing over 25 kilograms (approximately 55 pounds), [or]
. . . .
 b. More than the following number and types of animals are confined:
. . . .
 (3) 750 swine each weighing over 25 kilograms (approximately 55 pounds),
. . . .
 and either one of the following conditions are met: Pollutants are discharged into the water of the United States through a man-made ditch, flushing system or other similar man-made device; or pollutants are discharged directly into navigable waters which originate outside of and pass over, across or through the facility or otherwise come into direct contact with the animals confined in the operation. . . .
 c. The Board determines that the operation is a significant contributor of pollution to waters of the United States.
2 O.S. 1991, § 9-202[2-9-202](B)(2) (emphasis added).
Need For a Feed Yard License
¶ 2 Under the Oklahoma Feed Yards Act, "animal feeding operations"[1] that constitute feed yards must, before beginning operations, obtain a permit or license from the Board of Agriculture. 2 O.S.Supp. 1995, § 9-208[2-9-208].
¶ 3 While nonfeed yard animal feeding operations are not required to be licensed, their owners or operators, may, nevertheless, apply for a license and elect to come under the provisions of the Oklahoma Feed Yards Act. Id.
Application For a Feed Yard License
¶ 4 Operators seeking a feed yard license must file an application with the Board of Agriculture together with the required fee. 2 O.S. 1991, § 9-209[2-9-209]. The Board "shall issue a license therefor, provided the application discloses information assuring the Board that the operation of such feed yards be conducted in accordance with the standards set forth in this act and the rules and regulations of the Board." Id.
¶ 5 Under Department of Agriculture Rule 35:30-35-5, an applicant for a new feed yard license or a license to expand an operation to greater than 1,000 animal units, must provide the Board with various required information including diagrams or maps showing the location of the facility, the location of waters of the State, including drainage from the site, land application sites owned or leased by the applicant and waste storage facilities. Id. at subsection (a)(5). An applicant must also provide "Documentation showing notification issued to alllandowners of record within one-half (1/2) mile of proposedfacility, informing them of the opportunity to send writtencomments to the Board within 20 days from the date of notification." Rule 35:30-35-5(6) (emphasis added). That Rule also provides that issuance of a license "shall be based on technical and scientific findings of fact." Id.
Pollution Control Standards That Must Be Met By Feed YardApplicants
¶ 6 Standards which feed yard operators must demonstrate they meet include the duties imposed upon owners and operators at 2O.S.Supp. 1995, § 9-210[2-9-210], which, in part provides:
 Owners and operators who are granted a feed yards license shall: (1) provide reasonable methods for the disposal of animal excrement; (2) provide chemical and scientific control procedure for prevention and eradication of pests; (3) provide adequate drainage from feed yards premises of surface waters falling upon the area occupied by
such feed yards; take such action as may be necessary to avoid pollution of any stream, lake, river or creek; (4) provide adequate veterinarian services for detection, control, and elimination of livestock diseases; (5) have available for use at all necessary times mechanical means of scraping, cleaning, and grading feed yards premises; (6) provide weather resistant aprons adjacent to all permanently affixed feed bunks, water tanks, and feeding devices; (7) conduct feed yards operations in conformity with established practices in the feed yards industry as approved by regulations made and promulgated by the Board and in accordance with the standards set forth in this act.
2 O.S.Supp. 1995, § 9-210[2-9-210](A) (emphasis added).
¶ 7 Board Rule 35:30-35-9 establishes additional standards to be met by feed yard owners and operators. These duties include:
 (a) Discharge limitations. There shall be no discharge of process wastewater pollutants to surface or groundwaters of the state except in accordance with subsection i(b) of this section.
 (b) Releases in excess of the 25-year, 24-hour storm event. Process waste pollutants in the overflow may be discharged to surface waters of the state whenever rainfall events, either chronic or catastrophic, cause an overflow of process wastewater from a facility designed, constructed and operated to contain 21-day storage of process generated wastewaters plus the runoff from a 25-year, 24-hour rainfall event for the location of the point source.
There shall be no effluent limitations on discharges from detention structures constructed and properly maintained to contain the 25-year, 24-hour storm event. Retention structures shall contain 21-day storage of process wastewaters plus the 25-year, 24-hour storm event.
. . . .
 (d). . . . All discharges to containment structures shall be composed entirely of wastewaters from the proper operation and maintenance of a Concentrated Animal Feeding Operation and the runoff from the animal feeding operation area. The disposal of any materials (other than discharges associated with proper operation and maintenance of the CAFO) into the containment structures are prohibited.
 (e) Proper operation and maintenance requirements. The facilities licensed hereunder are required to document all Best Management Practices (BMPs) used to comply with the effluent limitations in this section.
Rule 35:30-35-9 (emphasis added).
Required Feed Yard Management Practices
¶ 8 Subsection (e)(1) of Rule 35:30-35-9 lists the "Best Management Practices" (BMPs) that must be used by feed yards. Those practices include:
 (A) Control facilities must be designed, constructed, and operated to contain all process generated wastewaters and contaminated runoff from a 25-year, 24-hour rainfall event for the location of the point source. Calculations may also include allowances for surface retention, infiltration, and other site specific factors. . . .
 (C) Open lots and associated wastes shall be isolated from outside surface drainage by ditches, dikes, berms, terraces or other such structures designed to carry peak flows expected at times when the 25-year, 24-hour rainfall event occurs.
 (D) No waters of the state shall come into direct contact with the animals confined on the Concentrated Animal Feeding Operation. Fences may be used to restrict such access.
 (E) Wastewater retention facilities or holding pens may not be located in the 100-year flood plain unless the facility is protected from inundation and damage that may occur during that flood event.
 (F) There shall be no water quality impairment to public and neighboring private drinking water wells
due to waste handling at the facility. Facility wastewater retention facilities, holding pens or waste/wastewater disposal sites shall not be located closer to public or private water wells than the distances specified by state rules or health codes.
. . . .
 (H) Waste handling, treatment, and management . . . shall not result in the contamination of drinking water. . . .
 (J) The operator shall prevent the discharge of pesticide contaminated waters into surface or groundwaters of the state.
Rule 35:30-35-9(e)(1) (emphasis added).
Required Feed Yard Pollution Prevention Plan
¶ 9 Rule 35:30-35-9 at subsection (e)(2) also requires, as part of the Best Management Practices, that the operator develop a Pollution Prevention Plan:
 A Pollution Prevention Plan shall be developed for each licensed facility. Pollution Prevention Plans shall be prepared in accordance with good engineering practices and should include measures necessary to limit pollutants in runoff or groundwater. The plan shall describe and ensure the implementation of practices which are to be used to assure compliance with the limitations and conditions of this section. . . .
 (F) The plan shall include, at a minimum, the following items:
 (i) Each plan shall provide a description of potential sources which may reasonably be expected to add pollutants to runoff from the facility. Each plan shall identify activities and materials which may potentially be pollutant sources. Each plan shall include:
 (I) A site map, or topographic map indicating, an outline of the drainage area of the concentrated animal feeding area: each existing structural control measure to reduce pollutants in wastewater and precipitation runoff; and surface water bodies.
. . . .
 (VIII) The licensee shall include in the plan, site-specific documentation no significant hydrologic connection exists between the contained wastewater and surface or groundwaters of the state. Where the licensee cannot document that no significant hydrologic connection exists, the ponds, lagoons and basins of the retention facilities must have a liner which will prevent the potential contamination of surface or groundwaters of the state.
. . . .
 (cc) Where a liner is installed to prevent hydrologic connection, the licensee must maintain the liner to inhibit infiltration of wastewaters.
Liners shall be protected from animals by fences or other protective devices.
. . . .
 (X) Storage and land application of manure shall not cause a discharge of significant pollutants to surface or groundwaters of the state or cause a water quality violation in surface or ground-waters of the state.
Rule 35:30-35-9(e)(2) (emphasis added).
Question Presented:
 ¶ 10 In light of the potential pollution hazards associatedwith the operation of feed yards, you inquired whether the Boardof Agriculture is required to afford adjacent property ownersnotice and a hearing, conducted as an individual proceeding underthe Administrative Procedures Act, prior to the issuance of afeed yard license.
 II. DUE PROCESS RIGHTS OF LOCAL LANDOWNERS
General Due Process Requirements
¶ 11 Generally, the state cannot affect a person's liberty or property interest without affording that person his or her due process rights, which usually requires notice and a meaningful opportunity to address the issues involved. E.g., Perry v.Sindermann, 408 U.S. 593 (1972); and Board of Regents v. Roth,408 U.S. 564 (1972).
¶ 12 As the United States Supreme Court held in Board ofRegents v. Roth, before one can assert deprivation of property interests without due process of the law, that individual must possess a constitutionally protected property interest. The United States Court of Appeals for the Eleventh Circuit, inPeterson v. Atlanta Housing Authority, 998 F.2d 904, 914 (11th Cir. 1993), recognized that property rights are not created by the Constitution, but rather are created by existing rules or understandings that stem from an independent source such as state law. Thus, as held by the Court of Appeals for the Tenth Circuit in Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988), the determination of whether a plaintiff has a property interest is a question of state law.
¶ 13 Decisions of the United States Supreme Court conclude that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v.Brewer, 408 U.S. 471, 481 (1972); Mathews v. Eldridge,424 U.S. 319, 334 (1976). In Eldridge, the Supreme Court held that the identification of the specific dictates of due process in any particular instance requires "consideration of three distinct factors" (424 U.S. at 335):
 1. "[T]he private interest that will be affected by the official action;"
 2. "[T]he risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and
 3. "[T]he Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
Instances in Which the Oklahoma Board of Agriculture Is Requiredto Afford Adjacent and Other Landholders With Notice andOpportunity to Participate in a Trial-like Individual Proceeding,Prior to the Issuance of a Feed Yard License
¶ 14 Two Oklahoma cases, both of which dealt with the State's issuance of a landfill permit, are instructive on Oklahoma's view of the circumstances in which adjacent landowners are entitled to notice and an opportunity to be heard prior to the issuance of a land use permit.
¶ 15 The first of these cases (which was in part overruled by the second) is Stewart v. Rood, 796 P.2d 321 (Okla. 1990). InStewart, the Court recognized that neither the Oklahoma Solid Waste Management Act,[2] 63 O.S. 1981, §§ 2251[63-2251] et seq.,
nor the Oklahoma Administrative Procedures Act, 75 O.S. 1991 andSupp. 1995, §§ 250-323, requires an individual proceeding be conducted prior to the issuance of a landfill permit.Stewart, 796 P.2d at 326-327 and 329-333. The Stewart court thus concluded that there was no statutory requirement that adjacent landowners, who claim that the issuance of a landfill permit would adversely affect their property, be afforded a hearing prior to the issuance of a permit.
¶ 16 The Stewart Court then decided whether constitutional principles of due process, under either the State or Federal Constitution, required that the adjacent landowners be afforded notice and a hearing prior to the issuance of the landfill permit. In concluding that constitutional principles did not vest the adjacent landowners with such rights, the Court held that to be entitled to a hearing and notice prior to the issuance of a license, the issuance of the license would have to have animmediate, direct and substantial effect upon the adjacent landowners rights:
 [A]s a general matter . . . for a person to be entitled to a hearing to oppose the granting of a State license it must be shown the legal or property rights of the person will be adversely affected. This affect must be direct, substantial
and immediate, rather than contingent on some possible remote consequence or a mere possibility of an unknown future eventuality. We have also held that whether a person has a right to contest an administrative action is largely a question of law.
796 P.2d at 333 (emphasis added and original emphasis underlined).
¶ 17 The Stewart Court held that the landowners' claimed deprivation of property rights were at best speculative and remote future eventualities upon which no due process claim could be based:
 The mere granting of a permit itself for one individual to use their land for a landfill does not invade a legally recognized interest of adjoining landowners. Most of the claims of the Appellants are speculative, at best, and in actuality concern possible remote future eventualities, such as whether the landfill will at some time become a nuisance. They cannot base a claim to due process on such a possible remote occurrence.
796 P.2d at 334 (emphasis added).[3]
¶ 18 Three years later, in DuLaney v. Oklahoma StateDepartment of Health, 868 P.2d 676 (Okla. 1993), the Oklahoma Supreme Court, in part, overruled its holdings in Stewart. InDuLaney, the Court concluded that adjacent property owners, under constitutional due process principles embodied in both Federal and State Constitutions, were entitled to notice and a hearing prior to the issuance of the landfill permit. Some landowners in DuLaney owned mineral interests under the land upon which the landfill was to be built, others were adjacent property owners. They argued that the issuance of the landfill permit would not only adversely affect their ability to explore for and develop minerals under the land, but would also potentially involve air pollution, odor, traffic and safety problems, and underground water pollution — including pollution of groundwater used by them. They also argued that their property would be devalued and further claimed a general decline in the area's aesthetics and environment. 868 P.2d at 680.
¶ 19 In DuLaney, evidence was introduced by a petroleum engineer that use of the surface as a landfill would create numerous problems for oil and gas exploration, development and recovery. The petroleum engineer testified to numerous specific problems with oil and gas operations which the landfill would cause. Based on this testimony, the DuLaney Court concluded that the issuance of the permit "may impair recognized and well-defined property rights of the mineral interest owner."
 Due process requires that the mineral interest owner be given notice and an opportunity to contest the permit at the administrative level. The due process clauses of the United States and the Oklahoma Constitutions provide that certain substantive rights — life, liberty and property — cannot be deprived except by constitutionally adequate procedures. Once it is determined that due process applies, the question becomes what process is due. Here, the inquiry is answered by 75 O.S. 1981, § 314[75-314](a). It provides for an individual proceeding conducted under the Administrative Procedures Act pursuant to 75 O.S. 1981, § 309[75-309].[4]
DuLaney, 868 P.2d at 681.
¶ 20 In reaching this conclusion, the Court articulated when
minimum due process is required:
 Minimum standards of due process require that administrative proceedings, which may directly and adversely affect legally protected interests, be preceded by notice calculated to provide knowledge of the exercise of adjudicative power and an opportunity to be heard.
Id. at 680 (emphasis added).
¶ 21 In applying this standard to the question of whether adjacent landowners, as a matter of constitutional law, must be afforded notice and an opportunity to be heard prior to the issuance of the landfill permit, the Court overruled its prior holding in Stewart, and an intervening case, Sharp:[5]
 Stewart and Sharp also stand for the proposition that neither the United States nor the Oklahoma constitutions vest adjacent landowners with any legally recognized interest mandating the application of due process principles. The portion of the Stewart and Sharp opinions relating to the right to statutory notice has been overruled by the Legislature. Today, we revisit, and overrule, the portions of the opinions holding that adjacent landowners have no constitutionally protected interest requiring notice and an opportunity for hearing before the issuance of a landfill permit.
868 P.2d at 682 (emphasis added).
¶ 22 The DuLaney Court's language makes it clear that it was only overruling the portions of Stewart and Sharp which held that adjacent landowners had no constitutional interest which required notice and an opportunity to be heard before the issuance of a landfill permit. This conclusion was based on the adjacent landowners' specific allegations of harm. The adjacent landowners in DuLaney had specifically alleged harm, which in the Court's words:
 [C]annot be corrected either by the arrest or suppression of the offending party or by the application of a coat of paint. Their concerns include the potential for harmful contaminates in both the air and in ground water underlying their property, odor, property devaluation, and safety hazards — all arising from the landfill site.
Id.
¶ 23 Relying on a decision of the Alabama Supreme Court,Brown's Ferry Waste Disposal Center v. Trent, 611 So.2d 226
(Ala. 1992), the Oklahoma Supreme Court concluded that it agreed with the Alabama Court that "notice and an opportunity for a hearing must be afforded to citizenry whose health, property use, and drinking water may be affected by the location of a landfill site." DuLaney, 868 P.2d at 683.
¶ 24 The DuLaney Court made it clear that its decision only dealt with the State's issuance of landfill permits. The Court also made it clear that its conclusions in the case were based upon the specific allegations and specific evidence
presented. Thus, the DuLaney case cannot be read as a decision on the State's issuance of non-landfill permits or licenses. Nonetheless, the principles articulated in DuLaney are instructive in the case at hand.
Application of the DuLaney Principles to the State'sIssuance of Feed Yard Permits
¶ 25 The DuLaney decision was not decided in the abstract, that is, the Court was not asked to decide in the absence of specific allegations and evidence, whether adjacent and/or other landowners in close proximity to a proposed solid waste landfill, were, as a matter of law required to be afforded a due process hearing in order to protest the issuance of a permit. DuLaney
was decided on the basis of evidence which had been presented below, and allegations of specific damage presented below. Applying due process principles based upon these facts and allegations, the DuLaney Court concluded that due process, as a matter of constitutional law, required notice and hearing.
¶ 26 DuLaney and Stewart, which was only partially overruled, support the following general principles of law. First, unless either required by (1) statute or (2) due process constitutional principles, the issuance of a permit or license by the State, does not require that the State afford notice and conduct an individual proceeding.
¶ 27 Second, a due process hearing and accompanying notice is only necessary where the issuance of the permit or license by the State would have a direct, substantial and immediate affect upon legal or property rights of others. Stewart v. Rood,796 P.2d 321, 333 (Okla. 1990). Also see DuLaney v. Oklahoma StateDepartment of Health, 868 P.2d 676, 683 (Okla. 1993) ("Our conviction that adjacent landowners whose property may besubstantially affected by the installation of a landfill site have a due process right to notice and an opportunity to be heard is supported by statutory enactments ignored by the Stewart
Court.").
¶ 28 Third, a landowner's property rights include the right to lateral and subjacent support and water rights. DuLaney,868 P.2d at 684. The DuLaney opinion also points out that, at least to some extent, a landowner's property rights also include the right to be free from harmful air contamination and odors, property devaluation and safety hazards. Id. at 682. Thus, substantial, direct and immediate harm to such rights brought about by the issuance of a license or permit by the State require that the affected landowners be afforded notice and an opportunity to protest the issuance of the permit or license.
¶ 29 Applying these principles to the issuance of a feed yard license, under the Oklahoma Feed Yards Act, 2 O.S. 1991 andSupp. 1995, §§ 9-201 through 9-212 ("the Act"), we conclude that issuance of such a license must be preceded by notice and an opportunity to be heard when the written comments received by local landowners under the procedures established under the Act contain specific factual allegations of direct, substantial and immediate harm to their legal or property rights.
¶ 30 As noted above, under Department of Agriculture Rules promulgated under the Feed Yards Act, applicants for a feed yard permit, under Rule 35:30-35-5(6), must, among other things, present documentation "showing notification issued to all landowners of record within one-half (1/2) mile of proposed facility, informing them of the opportunity to send written comments to the Board within 20 days from the date of notification. Issuance of license shall be based on technical and scientific findings of fact."
¶ 31 This notification ensures that all adjacent landowners, as well as other landowners, if any, within the immediate vicinity, are notified of an applicant for a permit and given an opportunity to provide written comments. Under the principles applied in DuLaney, when those written comments contain specific factual allegations that the issuance of the permit may result in direct, substantial and immediate harm to the property or legal rights of other landowners, the Board must conduct an individual preceding, proceeded by proper notice, prior to the issuance of the requested feed yard license.[6]
¶ 32 As discussed above, the Supreme Court in Mathews v.Eldridge, 424 U.S. 319 (1976), indicated that the specific dictates of due process in a particular instance require consideration of three factors, which include "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. The Oklahoma Feed Yards Act, and the rules promulgated under it, contain many requirements designed to protect the land and waters of others from pollution. Applicants, under 2 O.S.Supp. 1995, § 9-210[2-9-210](A), are not only required to conduct their operation so as to avoid pollution of any stream, lake, river or creek, but also are required to conduct their feed yard operation under practices promulgated by the Board, which include restrictions on groundwater and surface pollution, and "best management practices" dealing with wastewater retention facilities and control of surface run off. The Board of Agriculture, in issuing a permit, must be satisfied that the proposed operation will protect the surrounding environment.
¶ 33 Given the safeguards built into the Oklahoma Feed Yards Act and the rules and regulations promulgated by the Board of Agriculture under that Act, damage to surrounding owners cannot be presumed. The procedure established under the Act, which requires notice to all landowners within half a mile of a proposed facility affording them an opportunity to make written comments regarding the issuance of a permit, affords those landowners a reasonable opportunity to bring to the Board's attention potential direct, immediate and substantial harm which may arise from the issuance of the proposed permit. This, we conclude, is consistent with the dictates of the United State's Supreme Court's due process analysis in Mathews v. Eldridge.
Here, affording landowners within a half-mile of the proposed facility with written notice and an opportunity to present written comments, reduces the risk of erroneous deprivation of any of their rights, particularly when coupled with the requirement that an individual proceeding be conducted in instances in which those comments raise specific factual allegations of direct, immediate and substantial harm. Under this scheme, landowners in close proximity to the proposed feed yard operation must each receive written notice of the proposed feed yard operation, are afforded an opportunity to bring their concerns of damage before the Board, and when those concerns show that direct, immediate and substantial harm may result from the issuance of the permit, are afforded a full "individual proceeding" hearing, to reduce the risk of erroneously depriving them of any of their rights.
¶ 34 No hearing, however, need be conducted when no specific factual allegations of direct harm are made. Thus, while the Board cannot presume harm to adjacent landowners, the procedural mechanism provided allows for a full hearing to protect landowners' interests when instances of potential direct, immediate and substantial harm are brought to the Board's attention. Under this scheme, needless hearings are avoided and at the same time, the risk of erroneous deprivation of local landowners' rights are adequately protected. Thus, the procedures afforded under the Oklahoma Feed Yards Act and the Board rules promulgated under the Act are adequate under the teachings ofMathews v. Eldridge.
 ¶ 35 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. The Oklahoma Feed Yards Act, 2 O.S. 1991 and Supp. 1995, §§ 9-201 through 9-212, and the Rules promulgated by the Oklahoma Board of Agriculture under that Act, require that applicants for feed yard licenses meet various requirements designed to avoid pollution of ground and surface water and other pollution.
 2. Under Rule 35:30-35-5(6), each landowner within one-half (1/2) mile of a proposed feed yard facility must receive written notice of the proposed facility and be afforded an opportunity to send written comments regarding the facility to the Board of Agriculture.
 3. Although under due process jurisprudence of both the United States Supreme Court and the Oklahoma Supreme Court, the Board of Agriculture need not conduct a hearing prior to the issuance of every feed yard permit, the Board of Agriculture must conduct a hearing — an individual proceeding under 75 O.S. 1991 and Supp. 1995, §§ 309-323 of the Oklahoma Administrative Procedures Act — when written comments received by landowners within the vicinity of the proposed feed yard operation present specific factual allegations showing that the proposed feed yard operation may have a direct, substantial and immediate effect upon their property or legal interest.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL
[1] The Oklahoma Feed Yards Act defines an "animal feeding operation," at 2 O.S. 1991, § 9-202[2-9-202](B)(1), as follows:
 "Animal feeding operation" means a lot or facility (other than an aquatic animal production facility) where the following conditions are met:
 a. Animals (other than aquatic animals) have been, are, or will be stabled or confined and fed or maintained for a total of forty-five (45) days or more in any twelve-month period, and
 b. Crops, vegetation, forage growth or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.
 Two or more animal feeding operations under common ownership are considered, for the purposes of this law, to be a single animal feeding operation if they adjoin each other of if they use a common area or system for the disposal of wastes.
[2] Oklahoma Solid Waste Management Act now renumbered as 27AO.S. Supp. 1995, §§ 2-10-101[27A-2-10-101] to 2-10-1111.
[3] In like manner, the Court rejected the landowners' liberty interest claim that the location of the landfill in close proximity to their homes harmed their quality of life. Id.
[4] In 1981, Section 314(a) of Title 75 provided:
 When the grant, denial, or renewal of a license is required to be preceded by notice and opportunity for hearing, the provisions of this act concerning individual proceedings apply.
Now renumbered, Section 314(A), effective July 1, 1992, provides:
 Except as otherwise specifically provided by law, the issuance or denial of a new license shall not require an individual proceeding.
In footnote 16 of its opinion in DuLaney, the Oklahoma Supreme Court noted the change in the statute, but nevertheless concluded that: "Because the necessity of notice and an opportunity for a hearing is based on constitutionally protected property rights, an individual proceeding would remain necessary under the 1992 amendment." 868 P.2d at 681.
[5] Sharp v. 251st Street Landfill, 810 P.2d 1270 (Okla. 1991).
[6] Although landowners who own land more than one-half (1/2) mile of the proposed facility are not, under the established procedure, entitled to individual notice, they are not prohibited from filing written comments with the Board. If their comments contain specific factual allegations, of direct, immediate and substantial damage to their property or legal rights caused by the proposed feed yard, they would be entitled to a hearing before the Board.